Paul W. Verner, Esq.
VERNER SIMON
30 Wall Street, 8th Floor
New York, New York 10005
pwverner@vernerlaw.com
212-502-5500

Kevon Glickman, Esq.
KEVON GLICKMAN LAW, LLC
P.O. Box 25
Gladwyne PA 19035
kevonglickman@icloud.com
610-761-6833

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LESLIE JEROME HARMON p/k/a "J-ROC", and BRONZ & BRAINZ PRODUCTIONS, INC., :<br><br>Plaintiffs, :<br>v. :<br><br>TIMOTHY ZACHARY (ZEDD) MOSLEY p/k/a "MOSLEY" also p/k/a "TIMBALAND", TIMBALAND PRODUCTIONS INC., TIMBALAND PRODUCTIONS, TIMBALAND MUSIC, MOSLEY MUSIC GROUP,  and MONO MUSIC GROUP, :<br><br>Defendants, :<br>and :<br><br>HIPNOSIS SONGS FUND LIMITED, HIPGNOSIS SONGS GROUP, HIPGNOSIS SONGS GROUP, LLC, :<br><br>Relief Defendants. : | Civil Action No.:<br><br><br><br><br><br><br><br>**COMPLAINT** |

Plaintiffs, LESLIE JEROME HARMON p/k/a "J-ROC" and BRONZ & BRAINZ

PRODUCTIONS, INC., by their attorneys, VERNER SIMON and KEVON GLICKMAN LAW

LLC, as and for their Complaint against the Defendants, TIMOTHY ZACHARY ("ZEDD") MOSLEY, TIMBALAND PRODUCTIONS, INC., MOSLEY MUSIC GROUP and MONO MUSIC GROUP, state as follows:

## STATEMENT OF THE CASE

1.      This case involves the failure and refusal of Defendant, a very successful music producer and artist, to honor his contracts with Plaintiff in good faith and to transparently account and then pay well-earned royalties to the Plaintiff - a producer and artist in his own right - co-producer, contributor and music creator who is directly and instrumentally responsible for much of the Defendant's success.

2.      Defendant's callous indifference to his unambiguous monetary obligations to the Plaintiff is absolutely intentional.  Defendant's intentional misconduct is pervasive and extends to his recent hypothecation of the co-produced musical recordings   (the "Recordings") to international entertainment conglomerates at prices in the millions of dollars while he secreted the intellectual property rights and financial interests of the Plaintiff.  These conglomerates are named here as Relief Defendants.

## JURISDICTION AND VENUE

3.      This Court has federal jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1332 and the Declaratory Judgment Act, 28 U.S.C. §2201 and §2202.

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5.    This Court may exercise personal jurisdiction over the Defendants because they are citizens of this state, the actions and omissions of the parties which occurred with the State of New York, Southern District of New York, the parties have previously agreed that New York law and venue control and/or the Plaintiffs suffered injury within this District.

6.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b) because all of the Defendants conduct substantial business within the State of New York and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the State of New York, and under 28 U.S.C. §1400(a) since the misconduct by the Defendants in relation to the Plaintiffs' intellectual property and financial rights occurred within this district.

## THE PARTIES

7.    Plaintiff LESLIE JEROME HARMON p/k/a "J-ROC" ("HARMON"), an individual and is a citizen of the state of Texas with an address located in DeSoto, Texas.

8.    Plaintiff, BRONZ & BRAINZ PRODUCTIONS, INC., ("B&BP") is corporation formed under the laws of the state of Texas and is a citizen of Texas with a principal place of business located at 2428 Kingsley Drive, Grand Prairie, TX 75050.  At all relevant times, B&BP took full assignment of all furnishing company duties under the subject contracts between Plaintiff HARMON and the Defendants herein.

9.    HARMON and B&BP may be referred to herein collectively as the HARMON PLAINTIFFS.

10.    Defendant, TIMOTHY ZACHARY (ZEDD) MOSLEY p/k/a/ "MOSLEY" ("MOSLEY") also p/k/a "TIMBALAND", is an individual and is a citizen of the state of Florida with an address located at 5400 Hammock Drive, Coral Gables, FL 33156-2106.

11.     Defendant TIMBALAND PRODUCTIONS, INC. ("TP INC.") is corporation formed under the laws of the Commonwealth of Virginia and is a citizen of that state, with a principal place of business located at 3000 Marcus Avenue, Suite 1W5, Lake Success, NY 11042.

12.     Alternatively, TP INC., is an inactive corporation originally formed under the laws of the Commonwealth of Virginia with its principal place of business at the residence of MOSLEY and managed by MOSLEY's manager, Gary Marella, located at  9255 Sunset Blvd., Suite 801, West Hollywood, CA 90069.

13.     Defendant TIMBALAND PRODUCTIONS ("TP") is an unincorporated association and/or dba designation operating under the laws of the state of New York and is a citizen of that state with a principal place of business at the residence of MOSLEY and/or managed by MOSLEY's manager, Gary Marella, located at 9255 Sunset Blvd., Suite 801, West Hollywood, CA 90069.

14.     Defendant MOSLEY MUSIC GROUP ("MOSLEY MUSIC") is an unincorporated association and/or dba designation and full-service record label operating under the laws of the state of New York and is a citizen of that state with a principal place of business at the residence of MOSLEY and/or managed by MOSLEY's manager, Gary Marella, located at 9255 Sunset Blvd., Suite 801, West Hollywood, CA 90069.

15.     Defendant MONO MUSIC GROUP ("MONO") is an unincorporated association and/or dba designation and full-service record label operating under the laws of the state of California and is a citizen of that state with a principal place of business at the office of MOSLEY's manager, Gary Marella, located at 9255 Sunset Blvd., Suite 801, West Hollywood, CA 90069.

16.     Defendants TIMBALAND, TP INC., TP, MOSLEY MUSIC and MONO may be referred to herein collectively as the DEFENDANT COMPANIES.

17.    The Defendant MOSLEY together with the DEFENDANT COMPANIES may be collectively referred to herein as the MOSLEY DEFENDANTS.

18.    The DEFENDANT COMPANIES are all dominated and controlled exclusively by MOSLEY and are the alter egos of MOSLEY either because they have been used as vehicles for perpetrating frauds or because they are severely undercapitalized, co-mingle their assets, fail to adhere to corporate formalities and/or habitually breach their corporate contracts so as to personally benefit MOSLEY.    As set forth more fully below, these Defendant Companies' corporate forms should be pierced and liability vicariously imposed upon MOSLEY.

19.     Relief Defendant HIPGNOSIS SONGS FUND LIMITED ("HIPGNOSIS LTD.") is a foreign limited liability company which operates as a purchaser, manager and investor vehicle which purchases and commercially exploits the musical works and recordings of various artists and producers within the United States domestic and worldwide markets, and which transacts business in the state of New York, with its headquarters located at P.O. Box 286, Floor 2, Trafalgar Court, Les Banques, St. Peter Port, Guernsey GY1 4LY UK.

20.    HIPGNOSIS LTD. acquires and amasses multiple music recording catalogues purchased from various well-known artists and then offers these assets as investment opportunities to qualified investors after placing respective catalogues into one of several affiliated "HIPGNOSIS [Roman Numeral]" administrative holding companies such as those set forth in **Addendum A** which is attached hereto.

21.    Relief Defendant HIPGNOSIS SONGS GROUP ("HIPGNOSIS") a publicly-traded music IP investment company which conducts business in the state of New York focused on the investment in the intellectual property rights of proven hit songs of cultural importance, primarily

in North America and Europe and which has a principal place of business located at England and Wales.

22.    HIPGNOSIS acquires and amasses multiple music recording catalogues purchased from various well-known artists and then offers these assets as investment opportunities to qualified investors after placing respective catalogues into one of several affiliated "HIPGNOSIS [Roman Numeral]" administrative holding companies such as those set forth in **Addendum A** which is attached hereto.

23.    Relief Defendant, HIPGNOSIS SONGS GROUP, LLC ("HIPGNOSIS LLC") is a limited liability company organized and existing under the laws of Delaware, is a citizen of the state of Delaware and has its principal place of business is located at 15503 Ventura Blvd., Suite 300, Encino, CA 91436.

24.    HIPGNOSIS LLC assists HIPGNOSIS and HIPGNOSIS LTD. in the domestic administration and management within the United States of the acquired and amassed multiple music recording catalogues so as to maximize their exploitation as investments.

25.    HIPGNOSIS LLC, HIPGNOSIS and HIPGNOSIS LTD. collectively engage in the administration and management of various musical works and recordings in which the HARMON PLAINTIFFS have financial royalty interests which remain undistributed to the HARMON PLAINTIFFS and which the HARMON PLAINTIFFS verily believe should be compelled to be placed in trust or Court administered escrow as set forth further herein.

26.    Relief Defendants HIPGNOSIS LTD., HIPGNOSIS, HIPGNOSIS FUNDS, and HIPGNOSIS LLC, may be referred to herein collectively as the RELIEF DEFENDANT COMPANIES.

27.     The RELIEF DEFENDANT COMPANIES have recently acquired, hold ownership stake in and/or administer the copyright(s) and/or associated royalty payment streams in and to, and/or license assets and interests hypothecated by the MOSLEY DEFENDANTS which include the royalty interests and intellectual properties of the HARMON PLAINTIFFS where the RELIEF DEFENDANT COMPANIES either knew, had good and sufficient reason to know,  or were otherwise negligent in exercising due diligence to discover that the HARMON PLAINTIFFS' royalty interests and intellectual properties were actively and fraudulently concealed by the MOSLEY DEFENDANTS in the asset acquisition transactions.  As set forth more fully below, the RELIEF DEFENDANT COMPANIES are legally responsible to the HARMON PLAINTIFFS to satisfy the MOSLEY DEFENDANTS' contractual and copyright obligations to the HARMON PLAINTIFFS.

## STATEMENT OF MATERIAL FACTS

### The Parties/Artists

28.     Plaintiff HARMON, professionally known as "J-ROC", is a Grammy Award winning American songwriter and music producer from Fort Worth, Texas. Active in the genres of Hip-Hop, R&B, Soul, Pop and Funk, HARMON actively appeared in the major music industry in 1993 and since then has frequently collaborated with the Defendant MOSLEY, professionally known as TIMBALAND and the Defendant Companies. Jerome Harmon has written, performed in the recording process and produced hit records for some of the biggest artists in the world including (amongst    others) Beyoncé, Justin    Timberlake, Jay-Z, Chris    Brown, Keri    Hilson, Ashlee Simpson, Mario, Nelly    Furtado, Jamie    Foxx, Michael    Jackson, Kat    Dahlia,    Robin Thicke and Chris Cornell.

29.    Defendant MOSLEY, professionally known as TIMBALAND, is also a Grammy Award winner as an American music producer and is a hip-hop and rhythm-and-blues performer. TIMBALAND contributed to the success of many recording artists in the early 21st century. He also created new record labels—Beat Club and Mosley Music Group—under the umbrella label of Interscope Records, a division of Universal Music Group.

30.    By the late 1990s MOSLEY had developed a signature sound that made him a much sought-after and often-imitated hip-hop and rhythm-and-blues producer. MOSLEY is known for creating syncopated rhythms and complementing them with quiet background rapping or obscure sounds, such as a whinnying horse. With an uncanny knack for crafting commercially successful singles and albums, MOSLEY produced hits for dozens of recording artists, including Jay-Z, Ginuwine, Elliott, Ludacris, and Snoop Dogg.

31.    In the early 2000s MOSLEY moved beyond the genres of hip-hop and rhythm and blues to produce albums for rock and pop stars, including Nelly Furtado, Justin Timberlake, Beck, Björk, Michael Jackson and Madonna. In addition to his notable work as a producer, MOSLEY continued to release albums, both as a solo artist and in conjunction with Magoo.

32.    MOSLEY received Grammy Awards for his work with Timberlake on the songs "Sexy Back" (2006), "Loves toned/I Think She Knows" (2007), and "Pusher Love Girl" (2013). He also earned a Grammy for his contributions to Beyoncé's "Drunk in Love" (2013).

### *Two Decades of Co-Production*

33.    Throughout MOSLEY's rise to his success as a producer in the music industry, MOSLEY needed to hire musicians and co-producers to work on records for MOSLEY to deliver to artists and labels. This is because MOSLEY is a "sampler" who uses a computer to capture, alter and

manipulate sounds which are consequently included in musical recordings, a percussionist, a Disk Jockey and a "beat maker", but is not formally trained as a musician and does not play musical instruments at a professional level.  Accordingly, MOSLEY was in need of various musicians such as HARMON to write and co-produce and/or play the musical instruments for the vocalists to sing or rap along with.   MOSLEY entered into various producer agreements with co-producers such as HARMON, either individually on a per-song/per-artist basis; or sometimes on a more long-term basis.

34.    These co-producer agreements customarily provided that TIMBALAND PRODUCTIONS would sign the contract with the record labels and artists on behalf of all co-producers, including himself; furnish his and the co-producer's services; collect the advance payments and producer royalties, and then would purportedly share the proceeds with the co-producer.  However, even though co-producers usually received their shares of money advances paid by the record companies or recording artists, the MOSLEY DEFENDANTS habitually failed to send royalty accounting statements or pay over the subsequently received royalties to any of the co-producers, including to the HARMON PLAINTIFFS.

35.    In 2007, the MOSLEY DEFENDANTS and the HARMON PLAINTIFFS entered into a written production agreement, amended by written agreement on April 11, 2013, pursuant to which the HARMON PLAINTIFFS agreed, among other things, to provide the MOSLEY DEFENDANTS with the following services: (i) exclusive services as a producer of master recordings of artists signed to Mosley's companies; and (ii) non-exclusive services as a producer and session musician for third party artists not signed to Mosley or any of his associated companies. The foregoing agreements are hereinafter collectively referred to herein as the

"MOSLEY-HARMON Contract."  A true and correct copy of the MOSLEY-HARMON Contract is attached to here and incorporated by reference as **Exhibit A**.

36.    The MOSLEY-HARMON Contract was performed by HARMON and MOSLEY for several years, until the habitual and continuous failure of the MOSLEY DEFENDANTS to properly and professionally account for royalties due and owed to the HARMON PLAINTIFFS became unacceptable and caused substantial financial damages and losses to the HARMON PLAINTIFFS.

### *The 2020 Dispute and Attempted Partial Resolution*

37.    In August 2020, after a turbulent pre-litigation negotiation, the HARMON PLAINTIFFS and the MOSLEY DEFENDANTS agreed to a written settlement and royalty payout agreement on a partial amount of the co-produced Recordings, previously performed by the HARMON PLAINTIFFS under the MOSLEY-HARMON Contract. The written Settlement Agreement is a valid and binding agreement.  The Recordings and musical compositions which were addressed by the written settlement agreement are listed in the attached **Exhibit B**.

38.    At that time the HARMAN PLAINTIFFS and the MOSLEY DEFENDANTS agreed to quantify and pay out royalties then due and owed to the HARMON PLAINTIFFS for services provided in connection with a limited group of recorded "masters (and any and all other versions and remixes thereof) embodied on certain identified recorded albums" ….. (and any and all versions thereof) (each a "Harmon  Master," and collectively the "Harmon Masters" and/or the Works)".

39.    The terms of this limited and partial resolution of the MOSLEY DEFENDANTS' failure to account and pay royalties to the HARMON PLAINTIFFS is hereinafter referred to herein as

(the "MOSLEY-HARMON Settlement Agreement").  A true and correct copy of that MOSLEY-HARMON Settlement Agreement is referred to and incorporated by reference as **Exhibit C** (**Exhibit C** will be filed under seal until any contrary Order of the Court because the parties agreed that it is deemed confidential).

40.    The MOSLEY-HARMON Settlement Agreement did not resolve the MOSLEY DEFENDANTS' failure to account for other co-production work performed by the HARMON PLAINTIFFS outside of the musical Recordings specifically referred to in the MOSLEY-HARMON Settlement Agreement (**Exhibit B**) and the HARMON PLAINTIFFS specifically reserved their rights to make additional claims on those other musical Recordings in the future.

41.    Pursuant to the MOSLEY-HARMON Settlement Agreement, the MOSLEY DEFENDANTS agreed and warranted that they had fully investigated each of the Harmon Masters in which the HARMON PLAINTIFFS provided producer services under the MOSLEY-HARMON Contract to determine the amount, if any, the HARMON PLAINTIFFS were entitled to receive as payment for any past release, use, exploitation, and/or distribution of those masters and musical compositions.

42.    Pursuant to the MOSLEY-HARMON Settlement Agreement the MOSLEY DEFENDANTS agreed that the Harmon Masters were created over multiple years, and were released, used, exploited, and/or distributed by multiple record companies, resulting in the MOSLEY DEFENDANTS' difficulty in obtaining past royalty statements for each Harmon Master.

43.    Pursuant to the MOSLEY-HARMON Settlement Agreement the MOSLEY DEFENDANTS agreed they had determined the amount of royalties the HARMON PLAINTIFFS were entitled to be paid for the Harmon Masters embodied on three of the listed albums, which are

identified in a "RECITAL B" set forth in MOSLEY-HARMON Settlement Agreement, namely: The 20/20 Experience, *The 20/20 Experience – 2 of 2*, and *Blurred Lines*, from inception through the end of a specific accounting period (the "*Timberlake & Thicke Masters*") (see **Exhibit B**).

44.    Pursuant to the MOSLEY-HARMON Settlement Agreement the MOSLEY DEFENDANTS agreed and determined, based on the royalty statements, that the Harmon Masters (embodied on the albums identified in "RECITAL B" set forth in the MOSLEY-HARMON Settlement Agreement) were then un-recouped and, therefore, no royalties were yet due or owing to the HARMON PLAINTIFFS: *Beyoncé*; *Special Occasion; Closer To The Truth*; *F.A.M.E., Fortune; Scream; Songbook; Unbroken; JHUD; Escapee*; and *Missy Elliott* (collectively referred to in the MOSLEY-HARMON Settlement Agreement as the "Un-recouped Harmon Masters"). THE HARMON PLAINTIFFS have never received any royalty accounting statement in connection with any of the approximately 125 recordings which were co-produced by Harmon and the MOSLEY DEFENDANTS.   These royalty accounting statements, which are customarily prepared by the record company which has a contract with the recording artist and which are issued semi-annually, will have specific references to whether or not the artist's and producers' royalty accounts are recouped.  If the royalty account is unrecouped, no royalty is payable, but the royalty accounting statement will specify the dollar amount of such unrecoupment.  If the royalty account is recouped, payment of the royalty due accompanies the accounting statement, and is paid to producer at the same time.  Accordingly, the Harmon Plaintiffs need to view and analyze the underlying royalty accounting statements issued by the various record companies to the TIMBALAND DEFENDANTS in order to verify whether or not royalties are owed.   The HARMON PLAINTIFFS are therefore unable to determine whether the MOSLEY DEFENDANTS have complied with the terms of the Settlement Agreement.

45.     Pursuant to the MOSLEY-HARMON Settlement Agreement the MOSLEY DEFENDANTS agreed and determined to continue in the future to pursue the collection of royalty statements pertaining to all of the other Harmon Masters identified in "RECITAL B" as set forth in the MOSLEY-HARMON Settlement Agreement (specifically excluding the *Timberlake & Thicke Masters* and the Un-recouped Harmon Masters) (collectively referred to in the MOSLEY-HARMON Settlement Agreement as the "Other Harmon Masters") (see **Exhibit B**)

46.     In short, as of August 2020, the MOSLEY DEFENDANTS and the HARMON PLAINTIFFS, in consideration of the HARMON PLAINTIFFS forbearing to sue on then existing claims otherwise provable in litigation, agreed to resolve, compromise, and settle those claims and disputes pursuant to the terms of the MOSLEY-HARMON Settlement Agreement.

47.     Since August 2020, the MOSLEY DEFENDANTS have only partially performed and have otherwise substantially breached the MOSLEY-HARMON Settlement Agreement by (i) failing to continue in the future to pursue the collection of royalty statements pertaining to all of the other Harmon Masters; (ii) failing to provide true and correct royalty accounting statements to the HARMON PLAINTIFFS; (iii) failing to provide any back-up documentation (i.e. the underlying record company semi-annual royalty accounting statements); and (iv) failing to adhere to MOSLEY DEFENDANTS' counsel's own request to HARMON PLAINTIFF'S attorney for assistance in contacting the various record companies to obtain royalty accounting statements on behalf of all parties.  The MOSLEY DEFENDANTS have thus failed to fulfill their contractual obligations.

48.     The HARMON PLAINTIFFS have issued repeated demands to the MOSLEY DEFENDANTS to cure the MOSLEY DEFENDANTS' breaches of the MOSLEY-HARMON Settlement Agreement.

49.     The MOSLEY DEFENDANTS have failed to cure their breaches of the MOSLEY DEFENDANTS' breaches of the MOSLEY-HARMON Settlement Agreement.

50.     The MOSLEY DEFENDANTS now owe the HARMON PLAINTIFFS substantial amounts of money in the form of unpaid royalties due and owed under the MOSLEY-HARMON Settlement Agreement.

### The Additional Claims

51.     In addition to the contract damages arising from the MOSLEY DEFENDANTS' breaches of the MOSLEY-HARMON Settlement Agreement which identified a limited group of co-produced music (see **Exhibit B**), the HARMON PLAINTIFFS are due and owed vast sums of money for unpaid royalties for work on other co-produced Recordings.  The additional co-produced musical Recordings for which the HARMON PLAINTIFFS are owed a full accounting and royalty payment from the MOSLEY DEFENDANTS pursuant to the terms of the original MOSLEY-HARMON Contract will be established in discovery.

52.     The HARMON PLAINTIFFS have issued repeated demands to the MOSLEY DEFENDANTS to cure the MOSLEY DEFENDANTS' breaches of the MOSLEY-HARMON Contract for work which was not addressed by the parties in the 2020 MOSLEY-HARMON Settlement Agreement.

53.     The MOSLEY DEFENDANTS have failed to cure their breaches of the MOSLEY DEFENDANTS' breaches of the MOSLEY-HARMON Contract separate and apart from their breaches of the MOSLEY-HARMON Settlement Agreement.

54.     The MOSLEY DEFENDANTS now owe the HARMON PLAINTIFFS substantial amounts of money in the form of unpaid royalties due and owed under the MOSLEY-HARMON

Contract separate and apart from their breaches of the MOSLEY-HARMON Settlement Agreement.

### *Fraudulent Concealment of The Plaintiffs' Interests*

55.     In or about late 2019, MOSLEY sold the TIMBALAND music catalogue and resulting income streams to the Recordings as identified herein to certain RELIEF DEFENDANT COMPANIES.

56.     The MOSLEY DEFENDANTS intentionally failed to disclose to those certain RELIEF DEFENDANT COMPANIES the separately identifiable financial interest of the HARMON PLAINTIFFS as a co-writer and co-producer of the Recording as identified in the MOSLEY-HARMON Contract.

57.     The MOSLEY DEFENDANTS intentionally failed to disclose to the RELIEF DEFENDANT COMPANIES the separately identifiable financial interest of the HARMON PLAINTIFFS as a co-writer and co-producer of the Recordings as identified in the MOSLEY-HARMON Settlement Agreement.

58.     The MOSLEY DEFENDANTS intentionally failed to disclose to the RELIEF DEFENDANT COMPANIES the MOSLEY DEFENDANTS' duties to account and pay royalties to the HARMON PLAINTIFFS pursuant to both the MOSLEY-HARMON Contract and the MOSLEY-HARMON Settlement Agreement.

59.     The RELIEF DEFENDANT COMPANIES relied upon false warranties made by the MOSLEY DEFENDANTS in the acquisition agreements where the MOSLEY DEFENDANTS intentionally failed to disclose to the RELIEF DEFENDANT COMPANIES the MOSLEY

DEFENDANTS' duties to account and pay royalties to the HARMON PLAINTIFFS pursuant to both the MOSLEY-HARMON Contract and the MOSLEY-HARMON Settlement Agreement.

60.    Alternatively, the RELIEF DEFENDANT COMPANIES negligently failed to conduct an investigation and diligently discover the longstanding contractual relationship between the MOSLEY DEFENDANTS and the HARMON PLAINTIFFS while negotiating the acquisition agreements to procure the MOSLEY DEFENDANTS' catalogue.

61.    The RELIEF DEFENDANT COMPANIES' negligence in failing to conduct investigation and to diligently discover the notorious, openly reported, and lengthy contractual relationship between the MOSLEY DEFENDANTS and the HARMON PLAINTIFFS while negotiating the acquisition agreements to procure the MOSLEY DEFENDANTS' catalogue was gross, reckless and shockingly cavalier.  A routine check of the writer's credits of the Recordings, which are publicly available on multiple internet databases as well as on the liner notes of the recordings themselves, would have revealed that HARMON was a co-writer and co-producer of the Recordings.

### COUNT I

### BREACH OF CONTRACT
### (Against the MOSLEY DEFENDANTS)

62.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

63.    As stated above, the HARMON PLAINTIFFS and the MOSLEY DEFENDANTS entered into a valid contract – the MOSLEY-HARMON Contract.  The HARMON PLAINTIFFS previously attempted to resolve partial disputes under the MOSLEY-HARMON Contract by virtue of the 2020 MOSLEY-HARMON Settlement Agreement.

64.    The MOSLEY DEFENDANTS have failed to fulfil their obligations under both the MOSLEY-HARMON Contract and the 2020 MOSLEY-HARMON Settlement Agreement.

65.    The HARMON PLAINTIFFS have fully performed their duties under MOSLEY-HARMON Contract and the 2020 MOSLEY-HARMON Settlement Agreement.

66.    The HARMON PLAINTIFFS have issued multiple notices of breach to the MOSLEY DEFENDANTS and the MOSLEY DEFENDANTS have failed to cure those breaches.

67.    The MOSLEY DEFENDANTS now owe the HARMON PLAINTIFFS substantial amounts of money in the form of unpaid royalties due and owed under the MOSLEY-HARMON Contract and the MOSLEY-HARMON Settlement Agreement.

68.    The HARMON PLAINTIFFS have been damaged by the MOSLEY DEFENDANTS' breach of contract in an amount to be determined by a jury.


## COUNT II

### UNJUST ENRICHMENT
### (Against all Defendants)

69.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

70.    By reason of the foregoing facts, the MOSLEY DEFENDANTS and the RELIEF DEFENDANT COMPANIES, and each of them, have become and are continuing to be unjustly enriched at the expense of HARMON PLAINTIFFS by realizing monetary gain from their unpaid use of the HARMON PLAINTIFFS' musical, creative and co-production work as described herein.

71.    The MOSLEY DEFENDANTS and the RELIEF DEFENDANT COMPANIES, and each of them, have been unjustly enriched in an amount which cannot be precisely ascertained at this time, but will be ascertained according to the proof at trial.

**COUNT III**

**CONVERSION/THEFT**
**(Against All Defendants)**

72.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

73.    The MOSLEY DEFENDANTS and the RELIEF DEFENDANT COMPANIES have been assigned all property interests in the HARMON PLAINTIFFS' co-produced musical recordings pursuant to the underlying contracts which are now in a position of breach due to unpaid royalties.

74.    The failure to pay the HARMON PLAINTIFFS is now so pervasive and substantial that the MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, have legally rescinded the contracts by conduct and have subsequently converted the HARMON PLAINTIFFS' musical Recordings and intellectual property.

75.    The HARMON DEFENDANTS have notified the MOSLEY DEFENDANTS that the rights previously granted in the HARMON PLAINTIFFS' musical Recordings and intellectual property have been rescinded.

76.    The MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, continue to collect and distribute all gross royalties and fees from all sources from exploitation of the HARMON PLAINTIFFS' musical Recordings and intellectual property and have failed to deliver to the HARMON PLAINTIFFS any accounting information or royalties and/or other fees earned.

77.     The MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, have without license, right or authorization, exercised dominion and/or control over the HARMON PLAINTIFFS' musical Recordings  and intellectual property and have interfered, and continue to interfere, with and are in defiance of the HARMON PLAINTIFFS' superior legal rights in the intellectual property and created Recordings.

78.     The MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, have also failed and/or refused to deliver to HARMON PLAINTIFFS their share of the royalties and/or other fees which the MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, have derived from exploitation of HARMON PLAINTIFFS' property and Recordings and such taking of the HARMON PLAINTIFFS' rightful share of royalties and/or other fees  constitutes conversion.

79.     Since the MOSLEY-HARMON Contract was rescinded by the MOSLEY DEFENDANTS' failure to perform, the MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, no longer possess legal license, justification or privilege whatsoever to exploit the HARMON PLAINTIFFS' musical Recordings and intellectual property in any manner.

80.     The MOSLEY DEFENDANTS', and hence, the RELIEF DEFENDANT COMPANIES', conversion of Plaintiffs' property and monies are so willful, wanton and egregious that they shock the conscious of a reasonable juror and punitive damages are warranted.

81.     The HARMON PLAINTIFFS have been damaged by the MOSLEY DEFENDANTS', and hence, the RELIEF DEFENDANT COMPANIES', tortious conduct related to the musical Recordings and intellectual property.

**COUNT IV**

**BREACH OF IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING
(Against the MOSLEY Defendants)**

82.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

83.    The controlling agreements provide for the application of the laws of the state of New York.

84.    New York law implies a covenant of good faith and fair dealing in every contract pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

85.    The MOSLEY DEFENDANTS have breached their implied covenant of good faith and fair dealing in that they have both sought to prevent performance of the contract by ensuring that their agents and third-party contract parties (such as the RELIEF DEFENDANTS) do not recognize the HARMON PLAINTIFFS' financial royalty rights, or themselves engage in such pervasive and repeated breaches as to withhold all benefits of the contract from the HARMON PLAINTIFFS.

86.    As a result of the MOSLEY DEFENDANTS' breach of their implied covenant of good faith and fair dealing, the HARMON PLAINTIFFS have suffered reasonably foreseeable damages and injuries including, but not limited to royalties or other sums or fees owed to the HARMON PLAINTIFFS and/or received in trust by the RELIEF DEFENDANTS.

**COUNT V**

**BREACH OF FIDUCIARY DUTY**
**(Against the MOSLEY Defendants)**

87.     The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

88.     Under the MOSLEY-HARMON Contract, the MOSLEY DEFENDANTS were obligated to pay the HARMON PLAINTIFFS certain royalties and other sums.

89.     The MOSLEY DEFENDANTS received royalties, advances and other fees from recording companies on behalf of the HARMON PLAINTIFFS and as the sole collector, keeper and custodian of those monies, had and have a higher fiduciary duty to the HARMON PLAINTIFFS that goes beyond a mere contractual duty.

90.     The MOSLEY DEFENDANTS have materially breached and continue to breach their common law fiduciary duty to the HARMON PLAINTIFFS.

91.     The MOSLEY DEFENDANTS' multiple breaches of their fiduciary duties to the HARMON PLAINTIFFS are egregious, pervasive and intentionally committed in bad faith because the MOSLEY DEFENDANTS have clearly refused to satisfy their ongoing obligations to seek, collect and distribute royalties due to the HARMON PLAINTIFFS, have failed to honor the industry standard requests for accounting submitted by the HARMON PLAINTIFFS' entertainment counsel, Bernard M. Resnick, all in violation of the MOSLEY-HARMON Contract (**Exhibit A**) and the MOSLEY-HARMON Settlement Agreement (**Exhibit C**) and customary industry standard norms of commercial good faith.

92.     As a result of the MOSLEY DEFENDANTS' breach of fiduciary duty, the HARMON PLAINTIFFS have suffered reasonably foreseeable damages and injuries including, but not limited to royalties or other sums or fees received in trust by the MOSLEY DEFENDANTS.

## COUNT VI

## DECLARATORY JUDGEMENT

93.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

94.    As described above, the HARMON PLAINTIFFS have notified the MOSLEY DEFENDANTS of their breach of contract and failure to cure, as required under the MOSLEY-HARMON Contract and MOSLEY-HARMON Settlement Agreement, however, the MOSLEY DEFENDANTS continue to exercise dominion over the HARMON PLAINTIFFS' Recordings and to hypothecate those Recordings to third parties without compensation per the terms of the underlying contracts.

95.    As a result, the HARMON PLAINTIFFS are forced to ask the court to issue a declaratory judgement that the MOSLEY-HARMON Contract and MOSLEY-HARMON Settlement Agreement have been breached and that MOSLEY DEFENDANTS are entitled to a monetary judgment in an amount to be determined at inquest or by a jury.

96.    As a result, the HARMON PLAINTIFFS are forced to ask the court to issue a declaratory judgement that Harmon was a co-creator and joint owner of the Recordings and has a right to continuing royalties and is entitled to a monetary judgment in an amount to be determined at inquest or by a jury.

## COUNT VII

## INJUNCTION
## (As to The RELIEF DEFENDANTS)

97.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

98.     Pursuant to the MOSLEY-HARMON Contract and MOSLEY-HARMON Settlement Agreement the parties agreed that the services and work of the HARMON PLAINTIFFS was of a special, unique, unusual, extraordinary and intellectual character qualifying same for injunctive relief.

99.     Since the inception of their relationship in 2007, in the performance of the MOSLEY-HARMON Contract, and continuing until the present, the MOSLEY DEFENDANTS, and hence, the RELIEF DEFENDANT COMPANIES, have derived from the exploitation of HARMON PLAINTIFFS' property and Recordings and such taking of the HARMON PLAINTIFFS' rightful share of royalties and/or other fees and continue to administer the musical compositions acquired by RELIEF DEFENDANT COMPANIES which are owned or co-owned by the HARMON PLAINTIFFS.

100.    The MOSLEY DEFENDANTS have persistently breached the MOSLEY-HARMON Contract (and the Settlement Agreement) with the HARMON PLAINTIFFS despite the clear rights and obligations owed to the HARMON PLAINTIFFS.

101.    In light of the fraudulent concealment of the HARMON PLAINTIFFS' rights and interests by the MOSLEY DEFENDANTS from the RELIEF DEFENDANT COMPANIES now in control of the underlying MOSLEY DEFENDANTS' musical Recordings, the RELIEF DEFENDANT COMPANIES should be enjoined from distributing any royalties, investment returns, dividends or other profit based distributions, and certainly any sums still owed in the acquisition to the MOSLEY DEFENDANTS unless and until the MOSLEY DEFENDANTS and/or the RELIEF DEFENDANT COMPANIES, have fully satisfied the obligations owed to the HARMON PLAINTIFFS.

102.    The HARMON PLAINTIFFS have no other plain, speedy or adequate remedy at law, and the injunctive relief prayed for herein is necessary and appropriate at this time to prevent irreparable loss to the HARMON PLAINTIFFS' interests.


## COUNT VIII

### CONSTRUCTIVE TRUST
### (As to RELIEF DEFENDANTS)

103.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

104.    The RELIEF DEFENDANT COMPANIES derive substantial income and profit through the acquisition of the MOSLEY DEFENDANTS' musical catalogue without having assured through due and diligent efforts that the HARMON PLAINTIFFS and co-producers have been contractually satisfied.

105.    The RELIEF DEFENDANT COMPANIES should be compelled to account to the HARMON PLAINTIFFS and the HARMON PLAINTIFFS request the Court impose an equitable constructive trust over the RELIEF DEFENDANTS and then declare judgment that the RELIEF DEFENDANTS are legally obligated to now account, collect and distribute to the HARMON PLAINTIFFS all royalties and/or other sums held by the RELIEF DEFENDANT COMPANIES and now due to the HARMON PLAINTIFFS.

106.    The RELIEF DEFENDANT COMPANIES have received investor funds under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds without compensating the HARMON PLAINTIFFS for their financial interests and intellectual property rights.

107.    Further, specific financial interests and intellectual property rights acquired by the RELIEF DEFENDANT COMPANIES is traceable to the MOSLEY DEFENDANTS' wrongful acts and there is no reason in equity why the RELIEF DEFENDANT COMPANIES should be entitled to retain that property.

108.    As a result, the RELIEF DEFENDANT COMPANIES are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on property in the possession of RELIEF DEFENDANT COMPANIES that is traceable to MOSLEY DEFENDANTS' wrongful acts.

## COUNT IX

## ACCOUNTING

109.    The HARMON PLAINTIFFS repeat and re-allege each and every allegation contained in the preceding paragraphs of the Complaint above as if fully set forth here at length.

110.    The HARMON PLAINTIFFS have an contractual and financial interest in all of the money that is generated by the MOSLEY DEFENDANTS and/or the RELIEF DEFENDANTS from the distribution and exploitation of the musical Recordings in which the HARMON PLAINTIFFS interests are found.

111.    The HARMON PLAINTIFFS are informed and believe that the MOSLEY DEFEND-ANTS and/or the RELIEF DEFENDANTS have generated and earned an undetermined, yet substantial amount of money, due to the commercial success of the musical Recordings in which the HARMON PLAINTIFFS have a financial interest through sales, distribution, promotion, circulation, and other exploitation of original musical compositions and master recordings of the Recordings and as contained on other compilations, unauthorized remixes, and other fixations.

112.   The MOSLEY-HARMON Contract and MOSLEY-HARMON Settlement Agreement, provide for a right to an accounting from the MOSLEY DEFENDANTS and/or the RELIEF DEFENDANTS.

113.   The amount of money due and owed to the HARMON PLAINTIFFS is unknown to and cannot be ascertained without a full accounting of all of the MOSLEY DEFENDANTS' and the RELIEF DEFENDANTS' financial records related to the subject musical Recordings.

114.   The MOSLEY DEFENDANTS and the RELIEF DEFENDANTS have failed to provide an accounting to the HARMON PLAINTIFFS regarding the distribution of royalties and/or other fees under the MOSLEY-HARMON Contract and the MOSLEY-HARMON Settlement Agreement despite their knowledge that such accounting and fee payments are overdue.

115.   As a result of the MOSLEY DEFENDANTS' and the RELIEF DEFENDANTS' actions, or lack thereof, the HARMON PLAINTIFFS have been damaged in an amount to be proven after an accounting has been conducted by the HARMON PLAINTIFFS' forensic accountants/experts.

116.   Accordingly, the HARMON PLAINTIFFS hereby request that the Court order an accounting of all of the MOSLEY DEFENDANTS' and the RELIEF DEFENDANTS' financial records related to the co-produced master recordings in order to determine the sums rightfully due to the HARMON PLAINTIFFS.

WHEREFORE, the HARMON PLAINTIFFS demand judgment as follows:

   a.   On COUNT I, for Judgment against the MOSLEY DEFENDANTS for consequential damages in an amount to be determined by a jury, with interests, costs and attorneys' fees.

   b.   On COUNT II, for Judgment against the MOSLEY DEFENDANTS for consequential damages in an amount to be determined by a jury, with interests, costs and attorneys' fees.

c.  On COUNT III, for Judgment against the MOSLEY DEFENDANTS for consequential damages in an amount to be determined by a jury, with interests, costs and attorneys' fees.

d.  On COUNT IV, for Judgment against the MOSLEY DEFENDANTS for consequential damages in an amount to be determined by a jury, with interests, costs and attorneys' fees.

e.  On COUNT V, for Judgment against the MOSLEY DEFENDANTS for consequential damages in an amount to be determined by a jury, with interests, costs and attorneys' fees.

f.  On COUNT VI, for Declaratory Judgment against the MOSLEY DEFENDANTS declaring that the Contract and Settlement Agreement have been breached and that MOSLEY DEFENDANTS are entitled to a monetary judgment in an amount to be determined at inquest or by a jury.

g.  On COUNT VII, for an Order enjoining the RELIEF DEFENDANTS from further disbursing royalties and payments owed to the MOSLEY DEFENDANTS until full accounting and complete payment of the HARMON PLAINTIFFS' royalty and financial interests has been made.

h.  On COUNT VIII, for an Order equitably declaring that the RELIEF DEFENDANTS maintain in trust all royalty and financial interests of the HARMON PLAINTIFFS and directing the RELIEF DEFENDANTS to refrain from disbursing those royalty and financial interests unless under order directly such disbursement entered by this Court.

i.  On COUNT IX, for an Order equitably declaring that the MOSLEY DEFENDANTS and RELIEF DEFENDANTS shall account to the HARMON PLAINTIFFS for all unpaid HARMON PLAINTIFFS' royalty and financial interests.

j.  For such other and further relief as this Court deems just and warranted including costs and interest.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury on all claims for relief and issues triable by jury.

Dated: New York, New York
         May 18, 2023

                         Respectfully submitted,

                         */s/ Paul W. Verner*
                         Paul W. Verner, Esq.
                         VERNER SIMON
                         30 Wall Street, 8th Floor
                         New York, New York 10005

                         */s/ Kevon Glickman*
                         Kevon Glickman, Esq.
                         Kevon Glickman Law LLC
                         P.O. Box 25
                         Gladwyne PA 19035
                         kevonglickman@icloud.com
                         610-761-6833

                         *Attorneys for Plaintiffs*

# ADDENDUM A
# (HIPGNOSIS HOLDING COMPANIES)



# GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

- All
- Companies (/search/companies?q=hipgnosis)
- Officers (/search/officers?q=hipgnosis)
- Disqualifications (/search/disqualified-officers?q=hipgnosis)

## HIPGNOSIS LIMITED (/company/03588922)

03588922 - Incorporated on 26 June 1998

Malt Barn Cottage, Weavers Hill, Angmering, West Sussex, England, BN16 4BE

## HIPGNOSIS COPYRIGHTS PLC (/company/10368580)

10368580 - Incorporated on 9 September 2016 - Liquidation

Hermes House, Fire Fly Avenue, Swindon, SN2 2GA

## HIPGNOSIS GROUP HOLDINGS LTD (/company/14715375)

14715375 - Incorporated on 8 March 2023

71-75 Shelton Street, Covent Garden, London, United Kingdom, WC2H 9JQ

## HIPGNOSIS HOLDINGS UK LIMITED (/company/12123246)

12123246 - Incorporated on 25 July 2019

27-28 Eastcastle Street, London, England, W1W 8DH

## HIPGNOSIS MUSIC LIMITED (/company/09642326)

09642326 - Incorporated on 16 June 2015 - Liquidation

C/O QUANTUMA ADVISORY LIMITED, High Holborn House 52-54 52-54 High Holborn, London, WC1V 6RL

## HIPGNOSIS SFH I LIMITED (/company/10809693)

Matching previous names:
HIPGNOSIS SONGS HOLDINGS UK

10809693 - Incorporated on 8 June 2017

Eastcastle House, 27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- ## **HIPGNOSIS SFH XIII LIMITED (/company/11736239)**

  11736239 - Incorporated on 20 December 2018

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- ## **HIPGNOSIS SFH XIX LIMITED (/company/11923045)**

  11923045 - Incorporated on 3 April 2019

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- ## **HIPGNOSIS SFH XX LIMITED (/company/11922621)**

  11922621 - Incorporated on 3 April 2019

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- ## **HIPGNOSIS SONG MANAGEMENT LIMITED (/company/11425132)**

  11425132 - Incorporated on 20 June 2018

  United House 9 Pembridge Road, Notting Hill, London, England, W11 3JY

- ## **HIPGNOSIS SONGS LIMITED (/company/10795606)**

  10795606 - Incorporated on 31 May 2017

  Unit 35 Tileyard Studios, Tileyard Road, London, England, N7 9AH

- ## **THE FAMILY (MUSIC) 2021 LIMITED (/company/13470552)**

  Matching previous names:
  HIPGNOSIS SONG MANAGEMENT

  13470552 - Incorporated on 22 June 2021

  C/O Cc Young & Co, 3rd Floor, The Bloomsbury Building, 10 Bloomsbury Way, Holborn, London, England, WC1A 2SL

- ## **HIPGNOSIS SFH II LIMITED (/company/11465829)**

  11465829 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- ## **HIPGNOSIS SFH III LIMITED (/company/11465826)**

  11465826 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH IV LIMITED (/company/11633171)**

  11633171 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH IX LIMITED (/company/11692399)**

  11692399 - Dissolved on 6 October 2020

  27 - 28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH V LIMITED (/company/11633746)**

  11633746 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH VI LIMITED (/company/11633814)**

  11633814 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH VII LIMITED (/company/11633966)**

  11633966 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

- **HIPGNOSIS SFH VIII LIMITED (/company/11633923)**

  11633923 - Dissolved on 6 October 2020

  27-28 Eastcastle Street, London, United Kingdom, W1W 8DH

28 matches found

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/search?q=hipgnosis)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement
(https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House                                    © Crown copyright

# EXHIBIT A
# (HARMON-MOSLEY CONTRACT)

## AGREEMENT

AGREEMENT ("Agreement") made and entered into as of May 9, 2007 by and between Timbaland Productions, Inc. ("Company"), c/o Sedlmayr & Associates, P.C., 200 Park Avenue South, Suite 1408, New York, NY 10003, Attention: Theodor K. Sedlmayr, Esq., on the one hand, and Side By Side Entertainment, Inc. ("you") f/s/o Leslie Jerome Harmon ("Producer"), c/o Bernard M. Resnick, Esq., Bernard M. Resnick, Esq., P.C., Two Bala Plaza, Suite 300, Bala Cynwyd, PA, 19004, on the other hand.

WHEREAS, Company is in the business of recording, producing, manufacturing, selling and distributing records; and

WHEREAS, you are in the business of furnishing the services of Producer and causing Producer to produce master recordings and rendering musical services in connection therewith; and

WHEREAS, Company has previously engaged your services to furnish the services of Producer and Producer's services as a producer and musician, and you have caused Producer to render such services, on previously agreed upon terms and conditions; and

WHEREAS, Company desires to continue to engage your services to furnish the producer and/or musical services of Producer and the services of Producer hereunder, and you and Producer desire to render such services to Company, on the amended terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    <u>ENGAGEMENT</u>.

(a)    Company hereby engages you to furnish (i) to Company and Company's Affiliates the exclusive services of Producer and (ii) to third parties the non-exclusive services of Producer (as set forth herein) as (A) a producer, arranger, programmer, mixer and remixer ("Production Services") of master recordings and (B) a musician (including, without limitation, as a session musician in connection with Masters (as defined in paragraph 3 below) subject to this agreement) ("Musical Services") during the Term (as hereinafter defined). You accept such engagement and agree to cause Producer to render such exclusive Production Services and Musical Services upon the terms and conditions hereinafter set forth.  The Production Services and the Musical Services are sometimes collectively referred to herein as the "Services".

(b)    Notwithstanding anything to the contrary contained in paragraph 1(a) above:

(i)    Musical Services will not include Producer's services as a session musician rendered in connection with master recordings other than Masters hereunder; provided that any such services do not interfere with Producer's Services hereunder.

(ii)    The term "Services" will not include (A) any merchandising rights and/or endorsement rights utilizing the name and/or likeness of you and/or Producer, (B) any voice



tone rights with respect to Producer or (C) any performances by Producer as a musical recording artist or performances by Producer in any non-musical production; provided that any such performances do not interfere with Producer's Services hereunder.

2.    <u>TERM</u>.

(a)    (i)    The term ("Term") of this Agreement shall commence on the date hereof and continue thereafter for a period of two (2) years (sometimes referred to herein as the "Initial Period") unless extended or suspended as otherwise provided herein.

(ii)    (A)    Additionally, you hereby grant Company one (1) separate option to extend the Term for an additional Contract Period (the "Option Period") on the same terms and conditions applicable to the Initial Period except as otherwise specifically provided herein. Company shall exercise its option for the Option Period, if at all, by giving you written notice thereof at any time prior to the expiration of the Initial Period. If Company exercises such option, the Option Period will begin immediately after the expiration of the Initial Period and continue until the date twelve (12) months after the commencement of the Option Period.

(B)    Notwithstanding anything to the contrary contained in subparagraph 2(a)(ii)(A) above, in the event that Company fails to send you notice exercising its option for the Option Period, the Term hereof shall not terminate unless you give Company written notice setting forth the last timely date upon which you believe Company was obligated to give notice exercising its option as set forth in subparagraph 2(a)(ii)(A) above, and Company shall have fifteen (15) days after Company's receipt of such notice (the "Tolling Period") to exercise its option for the Option Period. If, after receipt of your notice, Company sends you notice exercising its option for the Option Period within the Tolling Period, then Company shall be deemed to have validly exercised its option for the Option Period and the Term will be deemed to continue in full force and effect without interruption.

(b)    Each year of the Term is sometimes referred to herein as a "Contract Period".

(c)    Notwithstanding anything to the contrary expressed or implied herein and without limitation of any of Company's rights or remedies, Company shall have the right, at its sole election, to terminate the Term of this Agreement upon the cessation by Company of all or part of its operations.  Upon any such termination, neither you nor Producer shall have any further obligation to render any services to Company and Company shall have no further obligation to you and Producer except those obligations of you and Producer and those of Company, respectively, which survive the end of the Term (e.g., indemnification obligations, royalty payment obligations, re-recording restrictions); provided, that, any such termination shall in no way (i) affect Company's rights in and to the results and proceeds of any and all of your and Producer's services under this Agreement, including, with out limitation, Company's rights with respect to the Production Services and Musical Services rendered hereunder, the master recordings produced, mixed, remixed, arranged and/or programmed pursuant to this Agreement and the musical performances rendered by Producer hereunder or (ii) limit Company's rights hereunder.



3.    <u>SERVICES</u>.

(a)    During the Term, you shall cause Producer to render the Services for Company and Company's Affiliates on an exclusive basis in connection with master recordings embodying the performances of such musical performers (such musical performers are hereinafter collectively referred to as "Artists" and individually as "Artist") as Company may designate from time to time (such master recordings referred to in this paragraph 3(a) are hereinafter collectively referred to as the "Company Masters" and individually as a "Company Master"). The Services to be rendered hereunder shall at all times be subject to the reasonable control, direction and supervision of Company.

(b)    (i)    During the Term, Company shall also have the non-exclusive, first priority right to cause you to furnish the Production Services of Producer to third parties (i.e. any party other than Company or any of Company's Affiliates) (each a "Third Party") in connection with master recordings embodying the performances of such musical performers (such musical performers are hereinafter collectively referred to as "Third Party Artists" and individually as "Third Party Artist") as such Third Party may designate (such master recordings produced [or remixed] by you pursuant to this paragraph 3(b) are hereinafter collectively referred to as the "Third Party Masters" and individually as a "Third Party Master"). Company shall determine in its sole good faith discretion whether to cause you to furnish Producer's Production Services in connection with a Third Party Artist.

(ii)    Subject to the provisions of paragraph 3(b)(i) above and this paragraph 3(b)(ii), you shall have the non-exclusive right during the Term to furnish Producer's services as a producer to third parties (other than a Third Party) (each an "Outside Third Party") in connection with master recordings embodying the performances of musical recording artists other than Third Party Artists (such musical recording artists are hereinafter collectively referred to as "Outside Third Party Artists" and individually as "Outside Third Party Artist"). If you and/or Producer receive offers or inquiries from third parties pertaining to Producer's producer services, you shall immediately submit all such offers and inquiries in writing to Company for Company's prior written approval, not to be unreasonably withheld or delayed. If Company fails to approve or disapprove any such offer or inquiry within ten (10) business days following Company's receipt of any such offer or inquiry, then Company shall be deemed to have approved same. In the event any such offer or inquiry is approved as provided herein, (A) you and Company shall meaningfully and reasonably consult in an effort to prevent any conflict with respect to Producer's Services to be rendered hereunder (including, without limitation, any potential scheduling conflicts) and Producer's professional producing commitments to Outside Third Parties with respect to any Outside Third Party Artists; provided that, in the event of any such conflict, the  Services to be rendered by Producer pursuant to this Agreement shall be accorded first priority and (B) you shall pay, or direct such Outside Third Party to pay (pursuant to a letter of direction ("Outside Third Party LOD") in a form acceptable to Company), to Company fifteen percent (15%) of any and all advances, fees and/or royalties ("Company Payment") payable to you and/or Producer (or your and/or Producer's designees and/or assigns) in connection with such services to any such Outside Third Party.  You and/or Producer shall cause any and all such Outside Third Parties to account and pay to Company any such Company Payment at the same time and in the same manner as payment is made to you in



connection therewith; provided, in the event such any such Outside Third Party fails to do so, you shall so account and pay to us any such Company Payment within thirty (30) days after your and/or Producer's receipt of your and/or Producer's share of advances, fees and/or royalties payable in connection with Producer's producer services to any such Outside Third Party. Company shall have the right to audit your books and records with respect to any such accounting on reasonable notice to you.

       (c)    The Company Masters and Third Party Masters are sometimes collectively referred to herein as the "Masters" and sometimes individually referred to herein as the "Master".

    4.    <u>RECORDING PROCEDURE</u>.

       (a)    With respect to each Master which Company requests you to cause Producer to produce, (or remix) hereunder, you shall cause Producer to:

         (i)    (A)    produce, arrange, program, record, mix, and edit (or remix, if applicable, but specifically excluding so-called specialty remixes) each such Master. You shall cause Producer to perform such other services in connection with each such Master as are customarily performed by producers (or remixers) in the recording industry, including, without limitation, engaging musicians, vocalists (but specifically excluding so-called featured side-artists), conductors, contractors, arrangers and copyists, and arranging, in conjunction with Company, for the use of recording studios and other necessary technical facilities and personnel.

         (B)    deliver to Company fully-edited and leadered stereophonic Masters technically and commercially satisfactory to Company and any Third Party to whom Company requires you to furnish Producer's Production Services. Upon Company's request, you shall cause Producer to re-record, re-mix (excluding specialty remixes except as provided for hereinbelow), re-edit and/or re-master any Master until a Master satisfactory to Company and/or any Third Party has been obtained. You shall deliver to Company such versions of each Master as Company may require. All original session tapes and any derivatives, duplicates or reproductions thereof shall also be delivered to Company, or to any other location designated by Company. As used herein the term "deliver" shall, with respect to any materials, mean the delivery of such materials to an authorized officer of Company, or the maintenance of such materials in your files as determined by Company at its sole discretion.

         (C)    maintain and submit job sheets and deliver to Company within seventy-two (72) hours after each recording session hereunder, properly completed session reports, and all other documents, information and other materials, if any, (including but not limited to Forms B and W-4 and similar withholding forms) required by Company or any Third Party to whom Company requires you to furnish Producer's Production Services in order to make payment when due of union scale compensation, or in order to effect timely compliance with any other obligations under any applicable agreement with any union or labor organization in connection with the Masters. You shall pay or reimburse Company, upon demand, for any penalties, fines, late charges or other costs incurred solely by reason of your and/or Producer's failure, or the failure of anyone engaged by you or Producer, to properly and timely comply with the foregoing; and any such sums paid by Company and not promptly reimbursed by you shall be a direct debt to Company and may, at



Company's option and without limiting any of Company's rights or remedies, be applied by Company in reduction of any royalties or other sums, if any, payable to you under this Agreement.

(D)    deliver to Company all necessary licenses, approvals, consents and permissions, other than those related to so-called featured side-artists. Your submission of Masters to Company shall constitute your representation that you have obtained all such licenses, approvals, consents and permissions. Company shall use all reasonable efforts to assist you in obtaining any such documents.

(E)    prepare and submit to Company for Company's approval a recording budget pursuant to which you and/or Producer, on behalf of Company, shall engage the services of all personnel required in connection with the recording of the Masters. You shall not incur any costs until Company has approved a budget. All recording costs shall be paid by Company or the applicable Third Party (subject, however, to the provisions of paragraph 4(a)(vi) hereof applicable in the event that such recording costs exceed the approved budget). Company shall use all reasonable efforts to assist you in preparing budgets hereunder.

(F)    deliver to Company copies of substantiating invoices, receipts, vouchers and similar satisfactory documentary evidence of recording costs, and if you fail to do so, Company's obligations to pay such costs will be suspended until delivery thereof. To the extent that the recording costs in connection with Masters produced hereunder exceed the recording budget therefor other than for reasons due solely to Company's acts or omissions, you shall be solely responsible for payment of such excess costs. Nothing contained in this Agreement shall obligate Company to permit the continuation of any recording session or project if Company reasonably anticipates that the recording costs will exceed those specified in the approved budget or that the Masters being recorded will not be technically and commercially satisfactory. In the event Company, in its sole discretion, pays any such excess costs, you shall promptly reimburse Company therefor upon demand. Moreover, Company shall have no obligation to pay (A) any recording costs with respect to any Masters which are not recorded in accordance with all of the material terms and conditions of this Agreement, (B) any recording fees or arranging fees which exceed union scale (unless such excess and the proposed recipient thereof are specified in the proposed budget and approved in writing by Company), or (C) any penalties, fines, late charges or other costs incurred for late payment of recording costs if such late payment is not the fault of Company. In the event Company pays or is charged with any costs or fees described in the preceding sentence, you shall be deemed responsible for such costs or fees so paid by Company, and you shall promptly reimburse Company therefor upon demand. Any sums paid by or charged to Company and not promptly reimbursed by you as provided in this paragraph may, shall be a direct debt to Company and may, at Company's sole election and without limiting Company's rights, be applied by Company in reduction of any royalties or other sums payable to you under this Agreement.

(ii)    Notwithstanding anything to the contrary contained in subparagraphs 4(a)(i)(C) through (F) above, at your request and as an accommodation to you, Company will cause the securing, preparation and submitting of the documentation required in such subparagraphs, as applicable; provided, however, you shall fully and timely cooperate with Company with respect to such securing, preparing and submitting of such documentation. In the event Company pays or is charged with any penalties, fines, late charges or other costs incurred for late payment of recording



costs or late submission of any required documentation resulting from your and/or Producer's failure to so cooperate, you shall be deemed responsible for such costs or fees so paid by or charged to Company, and you shall promptly reimburse Company therefor upon demand. Any sums paid by or charged to Company and not promptly reimbursed by you as provided in this paragraph may, shall be a direct debt to Company and may, at Company's sole election and without limiting Company's rights, be applied by Company, in the first instance, in reduction of any record royalties payable to you under this Agreement; provided that, to the extent any such record royalties payable to you under this Agreement are insufficient, such debt to Company may, at Company's sole election and without limiting Company's rights, be applied by Company in reduction of any mechanical royalties or other sums payable to you under this Agreement.

(b)    Neither you nor Producer (or anyone engaged by you or Producer) shall enter into any agreements on behalf of Company or incur, directly or indirectly, any liability or expense of any kind for which Company may be held liable, in connection with any recording session hereunder or otherwise, without having first obtained Company's prior written approval as to the nature, extent and limit thereof.

(c)    Each Company Master shall embody the studio performance by an Artist of a selection designated by Company and each Third Party Master shall embody the studio performance by a Third Party Artist of a selection designated by the applicable Third Party.

5.    <u>PRIOR MASTERS.</u>

(a)    As a material inducement for you to enter into this Agreement, Company shall pay to you a guaranteed advance ("Guaranteed Advance") in an amount not to exceed Sixty Four Thousand Dollars ($64,000) in connection with the master recordings of those certain musical compositions listed on Exhibit A hereto (the "Prior Masters"). You hereby acknowledge receipt of Forty Six Thousand Dollars ($46,000) of the Guaranteed Advance (the "Prior Payment") and further acknowledge that the balance of the Guaranteed Advance in the amount of Eighteeen Thousand Dollars ($18,000) has not yet, and may not, become payable to you hereunder (i.e., as indicated on Exhibit A, only certain portions of the Advances contained thereon have been paid to you as Company has not received (and may not receive) full payment of advances due Principal with respect to certain of those Prior Masters). (For the avoidance of doubt, you and Producer hereby acknowledge and agree that the Prior Payment constitutes adequate and sufficient consideration for the rights granted by you and Producer in this Agreement and for the services rendered and to be rendered by you and Producer under this Agreement. The balance of the Guaranteed Advance, if any, will be paid to you, if at all, on a Prior Master-by-Prior Master basis within fifteen (15) business days following such time as Company has received full payment of the applicable advance in connection therewith. You acknowledge and agree that the Guaranteed Advance constitutes the total Advances due to you and/or Producer in connection with the Prior Masters and is inclusive of any sums which may be due to you, if any, in connection with any musical services and or remixing/programming services you have rendered in connection therewith. The Guaranteed Advance shall constitute an Advance hereunder, recoupable from any and all monies (excluding mechanical royalties, except as specifically provided for herein) payable or becoming payable to you hereunder.



(b)     You acknowledge and agree that the Prior Masters shall be governed by the terms of this Agreement and all Advances due in connection therewith as set forth in Exhibit A have been paid, and, to the extent that any such Advance has not yet been paid, such Advance is hereby deemed included, if at all, in the Guaranteed Advance payable to you in accordance with the terms of paragraph 5(a) above.

(c)     You acknowledge and agree that the Prior Masters may not constitute all of the master recordings produced by Producer as of the date hereof and that, except as otherwise provided herein, any such master recordings shall be governed by the terms of this Agreement.

6.    ADVANCES/ROYALTIES: SERVICES FOR COMPANY AND/OR COMPANY'S AFFILIATES

In consideration of the Services rendered by you and Producer directly to Company or any of Company's Affiliates during the Term, your account will be credited as follows:

(a)     (i)     With respect to each Company Master (inclusive of any Company Master embodying the performances of an Artist who has entered into a recording artist agreement with Mosley Music (sometimes referred to herein as a "Mosley Music Artist")) produced by you without Principal, you will be paid an Advance in the amount of Five Thousand Dollars ($5,000) per such Company Master. Each such Advance shall be payable one-half (1/2) promptly following the commencement of recording of the applicable Company Master and the balance promptly following the delivery to and acceptance by Company of the applicable Company Master and all other licenses, information and materials required to be delivered hereunder. In the event Company exercises its option for the Option Period, the amount referred to in the first sentence of this subparagraph 6(a)(i) shall be increased to Six Thousand Five Hundred Dollars ($6,500) for each such Company Master the recording of which commenced in the Option Period. Solely for purposes of this paragraph 6(a)(i), if Producer co-produces any Company Master with King Solomon Logan ("Logan"), Logan shall be deemed excluded from the definition of Co-Producer with respect to the provisions of paragraph 6(a)(iii) below.

(ii)     (A)     With respect to each Company Master embodying the performances of a Mosley Music Artist which is produced by Principal with Production Services rendered by Producer for which you are to be paid a royalty as set forth in paragraph 6(c)(i)(A) or (B) below, as applicable, you will be paid an Advance in the amount of Five Thousand Dollars ($5,000) with respect to each such Company Master, subject to a maximum of Twenty Thousand Dollars ($20,000) with respect to any particular recording project. Each such Advance shall be payable one-half (½) promptly following the commencement of recording of the applicable Company Master and the balance, if any, promptly following the delivery to and acceptance by Company of the applicable Company Master and all other licenses, information and materials required to be delivered hereunder. Solely for purposes of this paragraph 6(a)(ii)(A), if Producer co-produces any Company Master with Logan, Logan shall be deemed excluded from the definition of Co-Producer with respect to the provisions of paragraph 6(a)(iii) below.



(B)    With respect to each Company Master embodying the performances of a non-Mosley Music Artist which is produced by Principal with Production Services rendered by Producer for which you are to be paid a royalty as set forth in paragraph 6(c)(i) below, you will be paid an Advance in the amount of Six Thousand Five Hundred Dollars ($6,500) with respect to each such Company Master, subject to a maximum of Twenty Six Thousand Dollars ($26,000) with respect to any particular recording project. Each such Advance shall be payable one-half (½) promptly following the commencement of recording of the applicable Company Master and the balance, if any, promptly following the delivery to and acceptance by Company of the applicable Company Master and all other licenses, information and materials required to be delivered hereunder. Solely for purposes of this paragraph 6(a)(ii)(B), if Producer co-produces any Company Master with Logan, Logan shall be deemed excluded from the definition of Co-Producer with respect to the provisions of paragraph 6(a)(iii) below.

(iii)    If any Company Master is produced by Producer with a Co-Producer(s), the applicable Advances payable to you pursuant to this paragraph 6(a) with respect to such Company Master shall be pro-rated by multiplying such amount by a fraction, the numerator of which is one (1) and the denominator of which is the total number of producers (including Producer but specifically excluding Principal) rendering services in connection with such Company Master.

(iv)    If Producer renders remixing/programming services with respect to any Company Master, you shall be paid One Thousand Five Hundred Dollars ($1,500) in connection with the remixing/programming of such Company Master. Each such payment shall constitute a non-recoupable fee and shall be payable one-half (½) promptly following the commencement of Producer's services in connection with the applicable Company Master and the balance promptly following the delivery to and acceptance by Company of the applicable Company Master and all other licenses, information and materials required to be delivered hereunder.

(b)    (i)    With respect to each Company Master (A) which is produced by Producer without Principal, (B) for which you are to be credited with a basic royalty rate as determined by Company in accordance with paragraph 6(c)(i)(A) or (B) below, as applicable, and (C) for which you are paid an Advance as set forth in paragraph 6(a)(i) or (ii) above, as applicable, the fees payable to you for Producer's Musical Services, if any, rendered in connection with each such Company Master shall not exceed of Two Thousand Five Hundred Dollars ($2,500).

(ii)    With respect to each Company Master (A) which is produced by Principal with Production Services rendered by Producer, (B) for which you are to be credited with a basic royalty rate as determined by Company in accordance with paragraph 6(c)(i)(A) or (B) below, as applicable, and (C) for which you are paid an Advance as set forth in paragraph 6(a)(i) or (ii) above, as applicable, the fees payable to you for Producer's Musical Services, if any, rendered in connection with each such Company Master shall not exceed of Three Thousand Dollars ($3,000).

(iii)    With respect to each Master (A) which is produced by Producer without Principal or by Principal with Production Services rendered by Producer, (B) for which you are to be credited with no royalty and (C) for which you are not to be paid an Advance, you shall be paid the actual fees for Producer's Musical Services, if any, rendered in connection with each such Master.



(c)    (i)    (A)    With respect to net sales through normal retail channels in the United States ("USNRC Net Sales") of albums comprised entirely of Company Masters produced by Producer without Principal, Company will credit your account with a royalty at a rate determined by Company in Company's sole discretion, which royalty rate will not exceed two percent (2%) of the suggested retail list price (or the wholesale equivalent thereof).

(B)    (I)    With respect to USNRC Net Sales of albums comprised entirely of Company Masters produced by Principal with Production Services rendered by Producer, Company will credit your account with a royalty at a rate determined by Company in Company's sole discretion, which royalty rate will not exceed one percent (1%) of the suggested retail list price (or the wholesale equivalent thereof).

(II)    Notwithstanding anything to the contrary contained in paragraphs 6(c)(i)(B)(I) above, in the event Principal's basic royalty rate is increased upon the achievement of certain sales plateaus as contained in the applicable Artist Agreement, Producer's Basic Royalty Rate shall be increased proportionately by no more than one quarter (¼) of a percentage point, on a prospective basis only, upon the achievement of each of such same sales plateaus. By way of example only, if Principal's basic royalty rate is increased from four percent (4%) to four and one-half percent (4-½%) upon the achievement of USNRC Net Sales of five hundred thousand (500,000) units of an album containing Masters produced hereunder, then Producer's Basic Royalty Rate will be increased from one percent (1%) to one and one quarter percent (1-1/4%) with respect to prospective sales of such album.

(C)    Notwithstanding anything to the contrary contained herein, no royalty shall be payable to you hereunder in connection with so-called remixes or with respect to Producer's services as a programmer.

(ii)    All royalties payable to you pursuant to paragraph 6(c)(i)(A) or (B), as applicable, shall be computed, determined, calculated, reduced and paid (but not escalated) in the same manner (e.g., container charges, free goods, suggested retail list price, reserves, etc.) as royalties payable to the applicable Artist are computed, determined, calculated, reduced and paid pursuant to such Artist's agreement with such Artist's record label (each, an "Artist Agreement"). Company shall furnish you with a redacted copy of the relevant provisions of each Artist Agreement; provided, that Company's inadvertent failure to do so shall not be deemed a breach hereof.

(iii)    Royalties payable to you for foreign sales, singles, budget records, club sales and other sales or uses of each Company Master shall be reduced in the same proportion that the applicable basic royalty rate payable to the applicable Artist for net sales of albums through normal retail channels in the particular territory in respect of such Company Master is reduced, provided that with respect to sales or uses of that Company Master for which the Artist receives a royalty which is computed as a percentage of Company's Net Receipts, net monies, or the like, your royalty hereunder in respect of such sale or use shall be equal to such Artist's royalty therefor multiplied by a fraction (the "Fraction"), the numerator of which is equal to your applicable basic royalty rate as set forth in the preceding paragraph 6(c)(i)(A) or (B), as applicable, and the



denominator of which is equal to the Artist's basic royalty rate for net sales of albums embodying the applicable Company Master.

(iv)    With respect to audiovisual recordings ("Videos") embodying Company Masters, your royalty shall be an amount equal to fifty (50%) percent of the amount determined by multiplying the applicable Artist's royalty for such Video by the Fraction, and your royalty shall be pro-rated as provided in paragraph 6(c)(iii) hereof. Notwithstanding anything to the contrary contained herein, you shall not be credited with any royalty in respect of a Video unless and until Company has recouped all costs incurred by Company (and/or the applicable distributor ("Distributor") which distributes records embodying Company Masters hereunder) in the production of such Video from its net receipts in respect of such Video (as net receipts are determined pursuant to the applicable Artist Agreement) and following such recoupment your royalty for such Video shall be credited to your account on a prospective basis only.

(v)    As to records not consisting entirely of Company Masters, the royalty rate otherwise payable to you hereunder with respect to sales of any such record shall be pro-rated by multiplying such royalty rate by a fraction, the numerator of which is the number of Company Masters which are embodied on such record and the denominator of which is the total number of royalty-bearing master recordings (including the Company Masters) embodied thereon.

(vi)    If any of the Company Masters are produced by Producer with a Co-Producer(s), the applicable royalty payable to you hereunder with respect to such Masters shall be pro-rated by multiplying such amount by a fraction, the numerator of which is one (1) and the denominator of which is the total number of producers (including Producer but specifically excluding Principal) rendering services in connection with such Company Master.

(vii)    Notwithstanding anything to the contrary contained in this Agreement, no royalties shall be payable to you with respect to a Company Master for which you are to be credited with a basic royalty rate as determined by Company in accordance with paragraph 6(c)(i)(A) and (B) above, as applicable, and for which you are paid an Advance as set forth in paragraphs 6(a)(i) and (ii) above unless and until all recording costs (specifically excluding the applicable Artist's "in-pocket" advances but including, without limitation any musician fees payable to you) in connection with the album (the "Album") embodying such Company Master have been recouped from the "net" royalties payable to the applicable Artist (i.e., the royalty payable to such Artist less any royalties payable to you or to any other individual producer of master recordings embodied on the Album or to any other third parties). Following such recoupment, royalties shall be payable to you retroactive to the first record sold subject to the recoupment of any Advances paid to you hereunder.

7.    ADVANCES/ROYALTIES: PRODUCTION SERVICES TO THIRD PARTIES.

In connection with the Production Services rendered by you and Producer with respect to any Third Party Masters during the Term, your account will be credited as follows:

(a)    (i)    With respect to each Third Party Master produced by Producer without Principal for Third Parties hereunder, Company shall pay you an Advance equal to thirty percent

(30%) of Company's net advance therefor. Any and all monies paid directly to you in connection with Company furnishing your Production Services to Third Parties shall be remitted by you to Company without reduction immediately after your receipt thereof.

        (ii)     With respect to each Third Party Master produced by Principal with Production Services rendered by Producer for Third Parties hereunder: (A) if the advance payable to Principal with respect to any such Third Party Master is less than Seventy Five Thousand Dollars ($75,000), Company shall pay you an Advance in the an amount of Six Thousand Dollars ($6,000) and (B) if the advance payable to Principal with respect to any such Third Party Master is a minimum of Seventy Five Thousand Dollars ($75,000), Company shall pay you an Advance in the an amount of Seven Thousand Five Hundred Dollars ($7,500). Any and all monies paid directly to you in connection with Company furnishing your Production Services to Third Parties shall be remitted by you to Company without reduction immediately after your receipt thereof. Solely for purposes of this paragraph 7(a)(ii), if Producer co-produces any Third Master pursuant to this paragraph 7(a)(ii) with Logan, Logan shall be deemed excluded from the definition of Co-Producer with respect to the provisions of paragraph 7(a)(iii) below.

        (iii)    If any Third Party Master is produced by Producer with a Co-Producer(s), the applicable Advance payable to you pursuant to paragraph 7(a)(i) or (ii) above, as the case may be, with respect to such Third Party Master shall be pro-rated by multiplying such amount by a fraction, the numerator of which is one (1) and the denominator of which is the total number of producers to whom Company or any Third Party is paying monies (including Producer) with respect to their rendition of services in connection with such Third Party Master.

        (iv)    Your share of any net advance is deemed an Advance under any agreement between Company and the applicable Third Party (each, a "Third Party Agreement") and shall constitute an Advance to you, recoupable from all royalties (excluding mechanical royalties) payable to you pursuant to this Agreement.

        (b)    (i)     Solely in respect of Third Party Masters produced by Producer without Principal during the Term, in accordance with the terms and conditions hereunder, Company shall credit to your royalty account an amount equal to thirty percent (30%) of Company's Net Receipts therefor. Your share of Company's Net Receipts shall be computed, reduced (but not escalated) and paid (or not paid), subject to the same deductions, reductions and calculations (including, but not limited to, packaging deductions, configurational variations, free-goods, reserves against returns, royalties for records sold outside the United States, key-outlet sales, club sales, PX sales, sales of cutouts, sales of budget records, sales at less than retail, sales inducement records, etc.) as Company's share of Net Receipts are computed, reduced and paid in accordance with applicable Third Party Agreement. In the event that the services of Co-Producer(s) are utilized in connection with any Third Party Master and Company or such Third Party is obligated to pay to such Co-Produce(s) a royalty or a share of the Net Receipts derived from any Third Party Master produced hereunder, your share of Net Receipts with respect to any such Third Party Master shall be reduced by the greater of: (A) the actual amount of the royalty paid to such Co-Producer(s); or (B) your otherwise applicable share of Net Receipts multiplied by a fraction, the numerator of which is one (1) and the denominator of which is the total number of producers (including Producer) utilized on said Third Party Master.



(ii)    Solely in respect of Third Party Masters produced by Principal with Production Services rendered by Producer for Third Parties hereunder, with respect to USNRC Net Sales of albums comprised entirely of such Third Party Masters, Company will credit your account with a royalty of one percent (1%) from the royalty received by Company in connection therewith. Your royalty shall be computed, reduced (but not escalated) and paid (or not paid), subject to the same deductions, reductions and calculations (including, but not limited to, packaging deductions, configurational variations, free-goods, reserves against returns, royalties for records sold outside the United States, key-outlet sales, club sales, PX sales, sales of cutouts, sales of budget records, sales at less than retail, sales inducement records, etc.) as Company's royalty is computed, reduced and paid in accordance with applicable Third Party Agreement.  In the event that the services of a Co-Producer(s) are utilized in connection with any Third Party Master and Company or such Third Party is obligated to pay to such Co-Producer(s) a royalty or a share of the Net Receipts derived from any Third Party Master produced hereunder, your royalty with respect to any such Third Party Master shall be reduced by the greater of:  (A) the actual amount of the royalty paid to such Co-Producer(s); or (B) your otherwise applicable royalty multiplied by a fraction, the numerator of which is one (1) and the denominator of  which is the total number of producers (including Producer) utilized on said Third Party Master.

7A.    <u>ADDITIONAL ADVANCE.</u>

Company shall pay to you an Advance (the "Legal Advance") in the amount of Three Thousand Dollars ($3,000) to be applied in respect of legal fees incurred by you in connection with the negotiation of this Agreement.  Notwithstanding anything to the contrary contained in the immediately preceding sentence, you hereby irrevocably authorize and direct Company to pay the Legal Advance on your behalf to Bernard M. Resnick, Esq. (the "Attorney"). The Legal Advance shall be payable promptly following full execution of this Agreement.  The payment of the Legal Advance is an accommodation to you alone. Nothing herein shall constitute the Attorney as a beneficiary of or party to this Agreement. You and Producer shall indemnify and hold Company and Principal harmless against any claims asserted against Company and/or Principal and any damages, losses or expenses incurred by Company and/or Principal by reason of such payment.  For the avoidance of doubt, the Legal Advance shall constitute an Advance hereunder.

8.    <u>ACCOUNTING.</u>

(a)    Company shall instruct the applicable Distributor to account and pay to you directly pursuant to a letter of direction in accordance with the terms of this agreement in substantially the same form as Exhibit B annexed here to and incorporated herein by reference at the same times and in the same manner as the applicable Artist is accounted and paid by Distributor with respect to the applicable Master hereunder, provided if the Distributor fails or refuses to do so, then Company will account and pay you amounts due you hereunder, if any, within thirty (30) days after Company's receipt of accountings and payments from the applicable Distributor, but no less frequently than twice per year. Company shall simultaneously furnish you with a copy of all accounting statements received by Company from the applicable Distributor as same pertain to records embodying the Master concerned.

(b)     You shall have the right to examine Company's books and records as same pertain to this agreement on reasonable notice to Company during normal business hours, provided, that you must do so within twenty-four (24) months from the date any such accounting statement was rendered, and if you object to any such accounting statement, you must notify Company of your specific objections to any such accounting statement no later than twenty-four (24) months from the date such accounting statement was rendered; your failure to do so shall be deemed to be your acceptance of any such statement and it shall be also deemed to be an account stated.   You acknowledge and agree that those of Company's books and records concerning the exploitation of the Masters hereunder might consist only of accounting statements received by Company from Company's Distributors and that Company shall not be responsible for any errors or omissions contained in any such accounting statements. You shall be foreclosed from bringing an action against Company with respect to any such accounting statement unless it is commenced in a court of competent jurisdiction within thirty-six (36) months from the date such statement was rendered. You shall not have the right to examine the books and records of any Distributor or any Third Party.

(c)     All royalty statements will be sent to you at your address first referenced above.

9.     <u>GRANT OF RIGHTS</u>.

(a)     As between you and Producer, on the one hand, and Company, on the other hand, each Master from the inception of its creation, shall be deemed a "work made for hire" for Company or its designee within the meaning of the United States copyright law. If it is determined that a Master does not so qualify, then such Master, together with all right, title and interest in and to it (including the sound recording copyright) shall be deemed transferred to Company by this Agreement. All such Masters, including all derivatives thereof, shall, from the inception of their creation, be entirely the property of Company in perpetuity, throughout the world, free of any claim whatsoever by you, or by any persons deriving any rights or interests from you. Without limiting its rights, Company shall have the sole and exclusive right in perpetuity and throughout the world:

(i)     to manufacture, advertise, sell, license or otherwise exploit or dispose of the Masters and phonograph records derived therefrom upon such terms, and under such trademarks and tradenames, as Company in its sole discretion elects, or in its sole discretion, to refrain therefrom; and

(ii)     to perform the Masters publicly and to permit the public performance thereof by any method now or hereafter known.

(b)     You agree that Company shall have the non-exclusive right, but not the obligation, to use your and Producer's names, voices, likenesses (audio or visual) and biographical information in connection with any use or exploitation of the Services and in connection with advertising, publicizing, exhibition and/or other exploitation of the Masters by Company, Company's Affiliates or any Third Party to whom Producer has rendered Production Services and Company's (and Company's Affiliates') business. Company shall have the right to issue publicity concerning you and Producer with respect to your and Producer's Services. Notwithstanding anything to the contrary



contained herein, during the Term of this Agreement you shall have the right to approve Producer's likenesses and biographical materials reproduced, printed, published or disseminated by Company hereunder, provided that such approval shall not be unreasonably withheld and any objections must be specific, in writing and received by Company within five (5) business days after you have been informed that the applicable likenesses and/or biographical materials are available for your inspection at Company's office. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the provisions of this paragraph 9(b). Once you have approved such likenesses and/or biographical materials, the same need not be approved again in respect of any subsequent use thereof. You will cause Producer to cooperate with Company, as it reasonably requests, in making photographs and preparing other materials for use in promoting Producer and the Masters. Company's inadvertent failure to comply with the provisions of this paragraph 9(b) shall not be deemed a breach of this Agreement.

        (c)    (i)    With respect to Producer's Production Services for Company and Company's Affiliates, Company and Company's Affiliates shall accord or use reasonable efforts to cause the applicable Distributor to accord you an appropriate credit (A) on the labels of records and the liner notes of albums derived from Masters produced hereunder, as applicable, (B) in one-half (½) page or larger advertisements placed in the United States in national trade magazines and Billboard Magazine "strip-ads" concerning records embodying solely the Masters and Singles, the "A-side" of which embodies a Master and (C) otherwise where Principal receives solely a producer credit with respect to Masters produced hereunder, in substantially the following form: "Produced by Timbaland for Timbaland Productions, Inc. and Jerome Harmon for Side by Side Entertainment and Timbaland Productions, Inc. and [additional producer, as applicable]." The inadvertent failure of Company, Company's Affiliates or a Distributor to comply with the foregoing shall not be deemed a breach of this Agreement. If you give Company written notice of any such failure, Company shall use reasonable efforts to cure, or cause the applicable Distributor to cure, same on a prospective basis.

        (ii)    With respect to Producer's Production Services for Third Parties, Company and Company's Affiliates use reasonable efforts to cause the applicable Third Party to accord you an appropriate credit on the labels of records and the liner notes of albums derived from Third Party Masters produced hereunder, as applicable, and in one-half (½) page or larger advertisements placed in the United States in national trade magazines and Billboard Magazine "strip-ads" concerning records embodying solely the Masters and Singles, the "A-side" of which embodies a Third Party Master, in substantially the following form: "Produced by Timbaland for Timbaland Productions, Inc. and Jerome Harmon for Side by Side Entertainment and Timbaland Productions, Inc. and [additional producer, as applicable]." The inadvertent failure of Company or Company's Affiliates or any Third Party to comply with the foregoing shall not be deemed a breach of this Agreement. If you give Company written notice of any such failure, Company shall use reasonable efforts to cause the applicable Third Party to cure same on a prospective basis.

10.    WARRANTIES.

    You and Producer hereby warrant, represent, covenant and agree as follows:

    (a)    You and Producer have the right (i) to enter into this Agreement, to perform

your respective obligations set forth herein and to grant the rights granted to Company herein and (ii) each warrant that there is a binding agreement ("Furnishing Agreement") between you and Producer pursuant to which you have the right to furnish the services of Producer. Simultaneously with the execution of this Agreement, you shall cause Producer to sign and you shall deliver to Company the inducement in the form annexed hereto as Exhibit C and incorporated herein by reference and furnish a copy of the Furnishing Agreement to Company.

(b)     Neither the results and proceeds of your services and Producer's Services (including, without limitation, any material furnished by you) nor the use by Company, Company's Affiliates or any Distributor or Third Party of the Masters shall violate or infringe upon the rights of any third party, including, without limitation, rights of copyright, trademark or servicemark, property, privacy or publicity, or other rights of any other kind.

(c)     (i)     Without limiting the generality of the foregoing, in rendering services hereunder, neither you nor Producer (or any person or entity engaged by you or Producer) will "sample" or otherwise incorporate into the Masters (for convenience "Sample" or "Sampling" herein) or permit any other party to Sample any copyrighted or otherwise proprietary material ("Proprietary Material") belonging to any person, other than Artist or Company (such party herein referred to as the "Owner") without having first (A) notified Company of the Proprietary Material you and/or Producer intends to use and the identity of the Owners thereof; (B) obtained Company's prior written approval of such intended use; and (C) secured from Owner(s) a written agreement, in a form satisfactory to Company, that Company shall have the perpetual right to use such Proprietary Material in the Masters and to exploit the Masters in any manner hereunder, all either without any payment whatsoever to Owner(s) or upon payment to Owner(s) of a payment approved by Company (the "Clearance Efforts"). Company shall have no obligation to approve or to make any such payment, and Company's approval of any such payment shall not constitute a waiver of any of Company's right or remedies.

(ii)     Notwithstanding anything to the contrary contained herein, if Company elects to undertake control of all of the Clearance Efforts hereunder, which Company shall not be obligated to do, you acknowledge and agree that any payments made by Company in connection with the Clearance Efforts, including Company's legal fees and costs in respect of such Clearance Efforts (the "Clearance Costs") shall, without limitation of Company's other rights and remedies, at Company's election, be treated as recording costs and shall be subject to the applicable approved budget hereunder.

(iii)     If Owner(s) seeks a share of the so-called "sound recording rights" and/or "publishing rights" for the use of Proprietary Material furnished by you in connection with the Masters, or any of them:

(A)     In connection with the Clearance Efforts of so-called "sound recording rights" for the use of such Proprietary Material, any and all Clearance Costs, including without limitation, (1) contingency participation (whether expressed in royalty or penny-rate terms, and including any advance against such contingency participation) conveyed, or (2) flat-fee "buy-out" paid, to any Owner(s) shall, as between you and Company, be borne equally by you and the Artist (to the extent such Artist agrees).

(B)    In connection with the Clearance Efforts of so-called "publishing rights" for use of such Proprietary Material, any conveyance or assignment to Owner(s) of any contingency and/or administration shall, as between you and Company, be borne by you and the Artist (to the extent such Artist agrees) proportionately to your and the Artist's respective interest in the applicable Controlled Composition.

(d)    <u>Intentionally Deleted.</u>

(e)    You and Producer are and will remain to the extent necessary, a member in good standing of all labor unions or guilds, membership of which may be required for the performance of your duties hereunder. You and Producer will comply with all union agreements, rules and regulation to which your services and Producer's Production Services shall be subject during the Term.

(f)    You and Producer agree to abide by all of the terms and conditions of agreements entered into by Company with third parties with respect to your services and Producer's Production Services, including, without limitation, any so-called "re-recording restrictions"; and you will sign such letters of inducement as may be required by such third parties.

(g)    Company will not be required to make any payment of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement, except as expressly provided herein.

(h)    With respect to each Master produced by Producer, you shall not cause Producer to perform or render any service for any other person other than Company, for the purpose of making phonograph records or masters embodying any composition rendered hereunder, prior to the date five (5) years subsequent to the date of delivery of the last Master containing such composition or two (2) years subsequent to the expiration of the applicable Artist Agreement, whichever is later. If you and/or Producer violate the foregoing restriction, Company may, in addition to any other right or remedy which it may have on account of such breach, terminate its obligation to pay you any further royalties on records embodying such Composition. Notwithstanding anything to the contrary contained in this paragraph 10(h), in the event Company and/or Principal receives more favorable terms with respect to the foregoing restriction in any Artist Agreement or any agreement Company enters into with a particular record label or distributor, then you shall be afforded such more favorable terms with respect to such restriction.

(i)    You and Producer agree that your and Producer's rights and remedies in the event of an act or an omission by Company constituting a breach of the provisions of this Agreement shall be limited to your right, if any, to recover damages in an action at law, but in no event shall you and/or Producer be entitled by reason of any such breach to terminate this Agreement, or to enjoin or restrain the recording, manufacture, distribution, sale or exploitation of the Masters or the advertising or promotion thereof.

11.   EQUITABLE RELIEF.

You and Producer acknowledge that your services and Producer's Services hereunder, as well as the Masters and the rights and privileges granted to Company under the terms of this Agreement, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by you and/or Producer of any material term, condition, representation, warranty, covenant or undertaking contained herein, Company will be caused irreparable injury and damage. You and Producer expressly consent to be bound, in a court of equity or in any other forum, by the above characterization of your services and Producer's Services (as well as of the Masters recorded hereunder and the rights and privileges granted to Company hereunder), and agree that Company shall be entitled to remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any and all other rights or remedies, for damages or otherwise, which Company may have.  (The preceding sentence will not be construed to preclude you from opposing any application for such relief based upon contest of the other facts alleged by Company in support of the application.)

12.   CLAIMS; INDEMNITY.

You and Producer will at all times indemnify and hold harmless Company, Principal, any Distributor, any Third Party and any of Company's Affiliates, licensees and/or assignees and any of Distributor's and any Third Parties respective affiliates, licensees and/or assignees, and any of their respective officers, directors, employees, representatives and assigns (individually and collectively referred to herein as the "Indemnitees") from and against any and all third party claims, damages, liabilities, costs and expenses, including, without limitation, legal expenses and reasonable attorneys fees, arising out of any alleged breach or breach by you and/or Producer of any undertaking, warranty, representation, covenant or agreement made by you and/or Producer herein; provided that such claim has been settled or has resulted in an adverse judgment against the Indemnitees in a court of competent jurisdiction. You and/or Producer will reimburse the Indemnitees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which the Indemnitees are entitled to be indemnified. Upon the making or filing of any such claim, action or demand, Company shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue. Company will release monies held pursuant to this paragraph if you make bonding arrangements, satisfactory to Company in its sole discretion, to assure Company of reimbursement of the amount of your potential liability under this paragraph. If Company has withheld and reserved any monies pursuant to the immediately preceding sentence, with respect to any claim and if said claim has not been followed by commencement of a legal action or proceeding within one (1) year from the date first made, Company will release such monies to you unless the claim is in the process of being settled or Company has a good faith reason to believe an action will be commenced in the future, without prejudice to its rights to again withhold and reserve monies in the future if any legal action or proceeding is later commenced.  You shall be notified of any such claim, action or demand and shall have the right, at your own expense, to participate in the defense thereof with counsel of your own choosing; provided, however, that Company's decision in connection with the defense of any such claim, action or demand shall be final.

13.    FORCE MAJEURE.

Company reserves the right, by giving you written notice, to extend the Term for the duration of any of the following contingencies, if, by reason of such contingencies, Company's or Company's Affiliates' and/or Distributors normal business operations are interrupted or become commercially impracticable: labor disagreements, fire, catastrophe, shortage of materials or any cause beyond Company's, Company's Affiliates', any Third Party's or any Distributor's control. The number of days equal to the total of such days of extension. If any suspension imposed under this paragraph by reason of an event affecting no record manufacturer or distributor or production company except Company continues for more than six (6) months, you may request by written notice that Company terminate the suspension by notice given to you within thirty (30) days after Company's receipt of your written notice.

14.    ASSIGNMENT.

Company shall have the right to assign this Agreement and any of its rights hereunder and to delegate any of its obligations hereunder, in whole or in part, to any entity owned or controlled by Principal. It is expressly acknowledged and agreed that this Agreement relates to Producer's personal services to be rendered in connection with the Services and you shall not have the right to substitute any person in Producer's stead, nor shall you have the right to transfer or assign this Agreement or any portion thereof, and any attempted assignment or transfer shall be null and void and shall convey no right or title of any kind.

15.    NOTICES.

Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by registered or certified mail, at the respective addresses hereinabove set forth, or such other address or addresses as may be designated by either party. Such notices shall be deemed given when mailed or delivered except that notice for change of address shall be effective only from the date of its receipt. Copies of all notices to you shall be sent to Bernard M. Resnick, Esq., Bernard M. Resnick, Esq., P.C., Two Bala Plaza, Suite 300, Bala Cynwyd, PA, 19004; provided, however failure to send a copy of notice will not impact the effectiveness of such notice or be deemed a breach hereunder.

16.    MECHANICAL LICENSES.

(a)    You shall cause the copyright proprietors to issue to Company or its licensees mechanical licenses for the United States and Canada for all Controlled Compositions (as hereinafter defined) embodied in the Masters at the rates set forth in paragraph 16(b) hereof.

(b)    All such Controlled Compositions shall be licensed to Company for the United States and Canada upon the same terms and conditions (including, without limitation, provision regarding "caps") as are then currently applicable pursuant to the agreements entered into by Principal with Distributors or pursuant to the applicable Artist Agreement, as the case may be, for compositions similarly written, composed, owned or controlled by Principal ("Principal Controlled Compositions") (except that, in the event Principal is granted a so-called "floor" with respect to the



"caps" provision of any such Artist Agreement or any such agreement between Principal and a Distributor, Company will use best efforts to secure such "floor" for you). Provided you and/or Producer or Producer's designee enter into a publishing agreement with Virginia Beach Music/Warner Chappell Music, Company will use best efforts to cause you to receive the same mechanical royalty rate with respect to Controlled Compositions as Principal receives with respect to Principal Controlled Compositions. Mechanical royalties for Controlled Compositions shall be calculated and paid in the same manner as mechanical royalties are currently calculated and paid in respect of the Principal Controlled Compositions (the relevant provisions of which shall be provided to you upon your request).

(c)    The license granted in this paragraph 16 includes the right, without additional compensation, to record, reproduce and perform the Controlled Compositions in synchronization with Videos.

(d)    Any assignment made of the ownership or copyrights in, or the rights to license or administer the use of, any Controlled Compositions shall be subject to the terms and provisions hereof.

(e)    Statements as to copyright royalties payable in connection with Controlled Compositions contained on records sold hereunder shall be rendered, accompanied by appropriate payments to you, as applicable (or, if applicable, the administrator of the Controlled Compositions), in accordance with Paragraph 8 hereof.

(f)    The provisions of this paragraph 16 shall constitute and are hereby accepted by you and Producer, on behalf of you and Producer and any other owner of any Controlled Compositions or any rights therein, as full compliance by Company or its licensees with all of Company's or its licensees' obligations, under the compulsory license provisions of the copyright laws of the United States or otherwise, arising from any use by Company or its licensees of the Controlled Compositions as contemplated under this Agreement.

(g)    (i)    Company will consult with you regarding the determination of ownership shares in the Controlled Compositions created hereunder; it being agreed that in the event of a dispute Company's decision with respect to such determination will control.  No casual or inadvertent failure to consult with you as provided in this subparagraph 16(g) will be deemed a breach of this Agreement by Company.

(ii)    The parties hereby acknowledge and agree that the percentages listed on Exhibit D hereto represent Producer's (or Producer's publishing company designee's) ownership interest in the compositions embodied in the Prior Masters listed on Exhibit D ("Prior Compositions").  Producer (or Producer's publishing company designee) shall own, solely to the extent of the percentages set forth on Exhibit D, the right, title and interests in and to the Prior Compositions, including the worldwide copyright and any and all renewal and extension rights.  Producer's publishing company designee shall administer Producer's shares of the Prior Compositions.  You and/or Producer and/or Producer's publishing company designee agree to issue to Company and/or Distributor a first use mechanical license for Producer's share of the Prior Compositions under the same terms and conditions as Principal licenses Principal Controlled



Compositions. Producer further grants to Company and/or Distributor a gratis synchronization license for Producer's share of the Prior Compositions in any video or other audiovisual devices.

17.    <u>DEFINITIONS.</u>

.As used in this Agreement, the following terms shall have the meanings set forth below:

(a)    The term "Masters" or "Master Recordings" shall mean original sound recordings on any substance or material now known or unknown, whether or not coupled with a visual image, embodying an Artist's performance of one (1) musical composition (or medley) usable in the recording, production and/or manufacture of records for sale to the public, including any duplicates thereof.

(b)    The terms "phonograph records" and "records" shall mean all forms of reproductions, whether known or hereafter devised, manufactured or distributed primarily for home use, juke box use or use in means of transportation embodying sound alone or sound coupled with visual images.

(c)    The term "Controlled Composition" means a musical composition written and/or composed, in whole or in part, by you and/or Producer and/or owned or controlled, in whole or in part, directly or indirectly, by you, Producer or by any person, firm or company in which you and/or Producer have any interest.

(d)    The term "Company's Affiliates" shall mean any person, firm or Company that (i) is substantially owned or controlled by Company, (ii) substantially owns or controls Company, or (iii) is under common ownership or control with Company. For the avoidance of doubt, Timbaland Productions, Inc., Mosley Music LLC and Interscope Records shall each be deemed one of Company's Affiliates.

(e)    The term "Net Receipts" shall mean gross monies received less any costs, expenses and payments expended in connection with the Masters (excluding any fixed overhead expenses) including, but not limited to, payments to co-producers, mixers, engineers, attorneys and accountants.

(f)    The term "Advance" shall mean a prepayment of royalties. Company may recoup Advances from royalties to be paid or accrued to or on behalf of you pursuant to this Agreement or any other agreement. Advances paid under paragraph 5, 6, 7 and 7A shall not be returnable to Company except as otherwise specifically set forth in this Agreement or in other circumstances in which Company is entitled to their return by reason of your failure to fulfill your obligations. Mechanical royalties shall not be chargeable in recoupment of any Advances except those Advances which are expressly recoupable from all monies payable under this Agreement or any other agreement.

(g)    The term "Principal" shall mean Timothy Mosley p/k/a "Timbaland".

(h)    The term "Co-Producer" shall mean any other producer specifically excluding Principal.

(i)    All capitalized terms used in this Agreement and not otherwise defined herein shall have the same meanings ascribed to them in the applicable Artist Agreement. In the event of any inconsistency between the definitions of a term as used in this Agreement and as used in the applicable agreement, such other agreement shall control.

18.    <u>CONFIDENTIAL INFORMATION.</u>

Neither you nor Company will use, nor cause Producer or Principal, respectively to use, for their own account or disclose to anyone else, during or after the Term, any propriety or confidential material or non-public information relating to the other's business, operations or interests which either party may obtain from the other, their respective employees or otherwise by virtue of the terms of this agreement, except that you and Company and Producer and Principal may disclose any such material and/or information solely to your and Producer's and Company's and Principal's respective attorneys, managers, accountants and if pursuant to any law or court order. The parties recognize and acknowledge that such proprietary and confidential information constitutes valuable, special and unique property of each of the parties  and their respective entities. In the event of a breach or threatened breach by either party of this paragraph, the other party shall be entitled to seek an injunction restraining such breaching party from disclosing any such information. The foregoing shall not prohibit either party from pursuing any other remedies available to it for such breach or threatened breach including without limitation, the recovering of damages.

19.    <u>BANKRUPTCY.</u>

In the event that Company is adjudicated bankrupt in a court of competent jurisdiction or of the compulsory liquidation of Company's assets, or the filing by or against Company of a petition for liquidation or reorganization, or in the event that Company shall make an assignment for the benefit of creditors, you shall have the right by written notice to Company to terminate the Term hereof. You shall not exercise that option by reason of the filing of a bankruptcy petition against Company by a third party unless  thirty (30) days elapse after the filing of the petition and the petition is not dismissed by order of the court within that time.

20.    <u>MISCELLANEOUS.</u>

This Agreement cannot be canceled, modified, amended or waived, in part or in full, in any way except by an instrument in writing signed by both parties hereto. No waiver by Company or you, whether express or implied, of any provision of this Agreement or any default hereunder shall affect Company's or your right to thereafter enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. No breach of this Agreement by Company shall be deemed material unless Company shall be given written notice of such breach and Company shall fail to cure such breach within thirty (30) days after receipt of such notice. This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New



York, or the Federal District courts, located in the County of New York; provided, however, if Company is sued or joined in any other court or forum in respect of any matter which may give rise to a claim by Company hereunder, you consent to the jurisdiction of such court or forum over any such claim which may be asserted by Company. Should any paragraph or provision of this Agreement be held to be void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. In entering into this Agreement, and in providing services pursuant hereto, you and Producer have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or Producer as Company's agents or employees. This Agreement may be executed in counterparts, by facsimile and/or electronically. All counterpart, facsimile or electronic signatures shall have equal validity and enforceability as a fully signed original agreement. **You specifically acknowledge that (i) you have been advised to seek your own independent legal counsel concerning the interpretation and legal effects of this Agreement, (ii) you have obtained such counsel or have freely chosen not to do so and (iii) this Agreement shall not be construed against either party as the drafter, it being agreed that this Agreement has been drafted jointly by the parties.**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

COMPANY:
Timbaland Productions, Inc.                          Side by Side Entertainment, Inc.

By: _____                       By: _____
    An Authorized Signatory                             An Authorized Signatory
                                                    Fed. ID No. __75 295 0485__

EXHIBIT A
"Prior Masters"
[Referenced in paragraph 5]

| Title | Artist | Label | Services | Advance |
|---|---|---|---|---|
| "Anonymous" | Bobby Valentino | IDJ | Co-production | $5,500 (paid in full) |
| "TBD" | Bobby Valentino | IDJ | Co-production | $5,500 (paid in full) |
| "TBD" | Mario | J | Co-production | $10,000 (paid in full) |
| "TBD" | Samantha Jade | Jive | Co-production | $7,000 (paid in full) |
| "Ayayaya" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |
| "Rule Breaker" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |
| "Murder" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |
| "Bittersweet World" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |
| "What I've Become" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |
| "Rag Doll" | Ashley Simpson | Interscope | Co-production | $3,000 (first half paid) |

**EXHIBIT B**
**LETTER OF DIRECTION**
**[Reference in paragraph 8(a)]**

**Timbaland Productions, Inc.**
**c/o Sedlmayr & Associates, PC**
**200 Park Avenue South**
**Suite 1408**
**New York, NY 10003**

As of : _____

_____
_____
_____

**Re:**  **Timbaland Productions, Inc. w/**_____ **f/s/o "**_____**" t/p** _____
**p/k/a "**_____**"**

Ladies and Gentlemen:

1.     Reference is made to the agreement between you and us dated as of _____ (the "Agreement").  Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Agreement.

2.     Although paragraph ____of the Agreement requires you to pay to us certain [advances/royalties] for the services of Timothy Mosley p/k/a "Timbaland" ("Producer") as [producer/remixer/programmer] with respect to certain master recordings ("Masters") embodying the performances of recording artist _____ p/k/a "_____" ("Artist"), we hereby request and authorize you to account and pay_____-. ("Company") on our behalf, out of [advances/royalties] otherwise due to us under the Agreement, simultaneously with the applicable payment to us, the following:

(a)     the amount of of _____Dollars ($_____) from the advance otherwise payable to us.

(b)     ___ percent (__%) of the royalty otherwise payable to us.

3.     The Agreement provides that you are to accord Producer credit on labels of records and the liner notes of Albums and Singles derived from the Masters.  The following credit ("Co-producer Credit") is to be included with the credit to Producer in substantially the following form:

"Produced by Timbaland for Timbaland Productions, Inc. and Jerome Harmon for Side By Side Entertainment and Timbaland Productions, Inc. and [additional producer, as applicable]."

No inadvertent failure to accord the Co-producer Credit shall be a breach of your obligations. You will use reasonable efforts to cure any such omission prospectively following your receipt of written notice thereof from us, if curable.

4.      Your compliance with this authorization will constitute an accommodation to us alone, and nothing herein shall vest in Company or Leslie Jerome Harmon ("Co-producer") rights as a beneficiary of or party to this instrument or any other agreement between you and us. All payments hereunder will constitute payment to us; you will have no liability by reason of erroneous payment you may make or failure to comply with this authorization.  We will indemnify and hold you harmless against any claims asserted against you and any damages, loses or expenses incurred by you by reason of any such payment or otherwise in connection herewith.

5.      All monies becoming payable under this authorization shall be remitted to Company at the following address or otherwise as the applicable payee directs you in writing and will be accompanied by statements with respect to those payments:

Side By Side Entertainment, Inc.
c/o Bernard M. Resnick, Esq.
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004

6.      All services rendered by the Co-producer, including, without limitation, each recording produced under the Agreement, shall be considered a "work made for hire" for you. The Masters and the performance contained thereon and records derived therefrom shall from the inception of their creation be entirely your property in perpetuity throughout the universe, under copyright and otherwise, free of any claim. You shall have the right to register the copyrights in such Masters in your name or the name of the designee(s) and to secure any and all renewals and extensions thereof. Without limiting the generality of the foregoing, Company, Co-producer and ourselves hereby assign to you all of our right and title to the copyrights in perpetuity throughout the universe in and to such Masters, records derived therefrom and any and all renewals and extensions of such copyrights.

Very Truly Yours,

**Timbaland Production, Inc.**

By: _____
     (an authorized signatory)

**EXHIBIT C**
**(Reference paragraph 10(a))**

**INDUCEMENT**

Pursuant to an exclusive producing agreement between Side By Side Entertainment, Inc. ("Company) and me (the "Producer Agreement"), Company is entitled to my exclusive producer services. I have been advised that concurrently herewith Timbaland Productions, Inc. ("TPI") is entering into an agreement with Company pursuant to which Company agrees to furnish my exclusive producer services to TPI (the "Agreement"). In order to induce TPI to enter into the Agreement with Company, I, the undersigned, hereby:

(a)     acknowledge that I have read and am familiar with all the terms and conditions of the Agreement;

(b)     assent to the execution of the Agreement and agree to be bound by the terms and conditions, warranties, representations and indemnifications thereof, including but not limited to each and every provision of the Agreement that relates to me in any way, directly or indirectly, the services to be rendered thereunder by me and restrictions imposed upon me in accordance with the provisions of the Agreement, and hereby guarantee to Artist the full and faithful performance of all the terms and conditions of the Agreement by Company and by me;

(c)     warrant and represent that if, during the term of the Agreement or any extensions or renewals thereof, Company ceases to be entitled to my services in accordance with the terms of the Producer Agreement, or if Company fails or refuses to furnish my producer services to TPI, I, at TPI's written request, will do all such acts and things so as to give TPI the same rights, privileges, and benefits as TPI would have had under the Agreement if Company had continued to be entitled to my producer services and if Company had continued to furnish my producer services to TPI; such rights, privileges, and benefits will be enforceable in TPI's behalf against me; and notwithstanding any breach by Company, all the terms and conditions contained in the Producer Agreement will be effective as if Company has assigned the Producer Agreement to TPI with my consent. No termination or modification of the Producer Agreement will operate to diminish my liability or obligations to TPI hereunder, and no breach of the Producer Agreement by Company will be sufficient cause for me to fail to fully perform for TPI pursuant to the Agreement and this agreement.

(d)     acknowledge and agree that TPI or any of its affiliates, subsidiaries, licensees and distributors shall be under no obligation to make any payments to me or otherwise, for or in connection with this inducement and for or in connection with the services rendered by me or in connection with the rights granted to TPI hereunder and under the Agreement and the fulfillment of my obligations hereunder and pursuant to the Agreement.

Leslie Jerome Harmon
Individually and o/b/o his publishing designee
BMI                          (ASCAP/BMI)
S.S. #:   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

26   Timbaland Jerome Harmon Producer Agmt v3execfinal

### **EXHIBIT D**
### (Reference paragraph 16(g)(ii))

| Title/Artist | % Producer Ownership |
|---|---|
| "Anonymous" (Bobby Valentino) | 12.5% |
| "TBD" (Bobby Valentino) | 12.5% |
| "TBD" (Mario) | 12.5% |
| "TBD" (Samantha Jade) | 12.5% |
| "Ayayaya" (Ashley Simpson) | 12.5% |
| "Rule Breaker" (Ashley Simpson) | 19% |
| "Murder" (Ashley Simpson) | 19% |
| "Bittersweet World" (Ashley Simpson) | 19% |
| "What I've Become" (Ashley Simpson) | 19% |
| "Rag Doll" (Ashley Simpson) | 19% |

DocuSign Envelope ID: 6692013A-648E-4052-B9EB-42CBD25ABC7B

# EXHIBIT B

**TIMBALAND PRODUCTIONS, INC.**
c/o Davis Shapiro & Lewit, LLP
150 S. Rodeo Drive, Suite 200
Beverly Hills, CA 90212
Attn: Damien Granderson, Esq.

As of April 11, 2013

Side By Side Entertainment Corp.
f/s/o Leslie Jerome Harmon
c/o Bernard M. Resnick, Esq.
Bernard M. Resnick, Esq., P.C.
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004

RE:    **Timbaland Productions, Inc. -w- Side By Side Entertainment Corp. f/s/o Leslie Jerome Harmon – Exclusive Producer Agreement**

Dear Gentlepersons:

The following, when signed by all parties, shall amend the agreement entered into by Timbaland Productions, Inc. ("Company"), on the one hand, and Side By Side Entertainment Corp. furnishing the services of Leslie Jerome Harmon (collectively, "Producer"), on the other hand, dated as of May 9, 2007, as amended (the "Agreement"). All terms not defined herein shall have the meanings ascribed to them in the Agreement.

Company and Producer hereby acknowledge and agree that, as of the date hereof, the Agreement remains in full force and effect. Notwithstanding anything to the contrary expressed or implied in the Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the following shall constitute a valid and binding amendment to the Agreement, effective as of May 7, 2012:

1. The Term of the Agreement is hereby extended for an additional period ending on April 11, 2015, upon the same terms and conditions contained in the Agreement.

2. With respect to each Third Party Master produced by Principal with Production Services rendered by Producer for Third Parties under the Agreement: (A) if the advance payable to Principal with respect to any such Third Party Master is greater than or equal to Fifty Thousand Dollars ($50,000), Company shall pay Producer an Advance in the an amount of Ten Thousand Dollars ($10,000) for such Third Party Master; and (B) if the advance payable to Principal with respect to any such Third Party Master is less than Fifty Thousand Dollars ($50,000), Company shall pay Producer an Advance in the an amount of Seven Thousand Five Hundred Dollars ($7,500) for such Third Party Master, and shall use reasonable efforts to cause such Third Party to pay Producer an additional

advance of Two Thousand Five Hundred Dollars ($2,500) for such Third Party Master.

Except as specifically modified herein, the Agreement remains in full force and effect, is binding by its terms, and is hereby ratified and confirmed as set forth herein.

Sincerely,

TIMBALAND PRODUCTIONS, INC.

By: _____
An Authorized Signatory

ACCEPTED AND AGREED TO:

SIDE BY SIDE ENTERTAINMENT CORP.

By: _____
An Authorized Signatory

By: _____
Leslie Jerome Harmon

# EXHIBIT B
# (HARMON-MOSLEY RECORDINGS
# COVERED BY SETTLEMENT AGREEMENT)



B.  Under the Company-Harmon Agreement, the Harmon Parties provided services in connection with solely the following masters (and any and all other versions and remixes thereof) embodied on the identified albums below (and any and all versions thereof) (each a "<u>Harmon Master</u>," and collectively the "<u>Harmon Masters</u>"):

| ARTIST | ALBUM(S)/MASTER(S) | RELEASE YEAR |
|---|---|---|
| Justin Timberlake | **The 20/20 Experience:**<br><br>**<u>Harmon Masters</u>**<br>Blue Ocean Floor<br>Don't Hold the Wall (ft. Timbaland)<br>Let The Groove Get In<br>Mirrors<br>Pusher Lover Girl<br>Space Coupe<br>Strawberry Bubblegum (ft. Timbaland)<br>Suit & Tie (ft. Jay-Z & Timbaland)<br>That Girl (ft. Timbaland & The Tennessee Kids)<br>Tunnel Vision (ft. Timbaland) | 2013 |
|  | **The 20/20 Experience – 2 of 2:**<br><br>**<u>Harmon Masters</u>**<br>Amnesia<br>Cabaret (ft. Drake & Timbaland)<br>Drink You Away | 2013 |

1

| | | |
|---|---|---|
| | Electric Lady (ft. Timbaland)<br>Gimmie What I Don't Know I Want<br>(I want) (ft. Timbaland)<br>Murder (ft. Jay-Z)<br>Not A Bad Thing<br>Only When I Walk Away (ft.<br>Timbaland, James Fauntleroy ll &<br>Brenda Radney)<br>Take Back the Night (ft. Timbaland)<br>TKO (ft. Timbaland)<br>True Blood (ft. Timbaland)<br>You Got It On | |
| Robin Thicke | **Blurred Lines:**<br><br>__Harmon Master__<br>Take It Easy On Me | 2014 |
| Beyoncé | **Beyoncé:**<br><br>__Harmon Masters__<br>Blow<br>Drunk in Love (ft. Jay-Z)<br>Partition<br>Rocket | 2013 |
| Bobby Valentino | **Special Occasion:**<br><br>__Harmon Masters__<br>Anonymous (ft. Timbaland)<br>Rearview (Ridin') | 2007 |
| Cher | **Closer To The Truth:**<br><br>__Harmon Master__<br>I Don't Have to Sleep to Dream | 2013 |
| Chris Brown | **F.A.M.E.:**<br><br>__Harmon Master__<br>Paper Scissors Rock (ft. Timbaland<br>& Big Sean)<br><br>**Fortune:**<br><br>__Harmon Masters__<br>Tell Somebody<br>Trumpet Lights | 2011<br><br><br><br><br><br>2012 |
| Chris Cornell | **Scream:**<br><br>__Harmon Masters__<br>Climbing up the Walls<br>Do Me Wrong (Japan Bonus Track)<br>Enemy<br>Get up<br>Ground Zero<br>Long Gone (ft. Timbaland)<br>Lost Cause (UK Deluxe Edition)<br>Love Comes Down | 2009 |

2

| | | |
|---|---|---|
| | Never Far Away<br>Ordinary Girl (Deluxe Edition)<br>Other Side of Town<br>Part of Me<br>Scream<br>Stop Me<br>Sweet Revenge<br>Take Me Alive (ft. Justin Timberlake)<br>Time<br>Two Drink Minimum (included as a hidden track inside of "Watch Out")<br>Watch Out<br>Why Do You Follow Me<br><br>**Songbook:**<br><br>**Harmon Masters**<br>As Hope and Promise Fade<br>Ground Zero | 2011 |
| Demi Lovato | **Unbroken:**<br><br>**Harmon Master**<br>All Night Long (ft. Missy Elliott) | 2011 |
| Jennifer Hudson | **JHUD:**<br><br>**Harmon Master**<br>Walk It Out (ft. Timbaland) | 2014 |
| Michael Jackson | **Xscape:**<br><br>**Harmon Masters**<br>Blue Gangsta<br>Chicago<br>Do You Know Where Your Children Are?<br>Love Never Felt So Good (ft. Justin Timberlake)<br>Loving You<br>Slave To The Rhythm | 2014 |
| Missy Elliott | **Missy Elliott:**<br><br>**Harmon Masters**<br>9th Inning (ft. Timbaland)<br>Triple Threat 9 (ft. Timbaland) | 2012 |
| Jay-Z | **Magna Carta … Holy Grail:**<br><br>**Harmon Masters**<br>F.U.T.W.<br>Fuckwithmeyou knowigotit (ft. Rick Ross)<br>Heaven (ft. Justin Timberlake)<br>Holy Grail (ft. Justin Timberlake)<br>Jay - Z BLUE<br>La Familia<br>Part ll (On The Run) (ft. Beyoncé | 2013<br><br>2009 |

3

| | | |
|---|---|---|
| | Knowles)<br>Picasso Baby (ft. The Dream, Zofia, Borucka & Moreno)<br>Tom Ford<br>Versus<br><br>**The Blueprint 3:**<br><br>**<u>Harmon Masters</u>**<br>Off That (ft. Drake)<br>Reminder<br>Venus Vs Mars (ft. Beyoncé Knowles) | |
| Timbaland | **Timbaland Presents Shock Value:**<br><br>**<u>Harmon Master</u>**<br>Apologize (OneRepublic Version)<br><br>**Timbaland Presents Shock Value 2:**<br><br>**<u>Harmon Masters</u>**<br>Can You Feel It (ft. Esthero)<br>Carry Out (ft. Justin Timberlake)<br>Ease Off the Liquor<br>Long Way Down (ft. Daughtry)<br>Lose Control (ft. JoJo)<br>Morning After Dark (ft. Soshy & Nelly Furtado)<br>Say Something (ft. Drake)<br>Symphony (ft. Bran 'Nu, D.O.E. & Attitude)<br>The One I Love (ft. Keri Hilson & D.O.E.)<br>Timothy Where You Been (ft. Jet)<br>Tomorrow In the Bottle (ft. Chad Kroeger & Sebastian)<br>We Belong to the Music (ft. Miley Cyrus) | 2007<br><br><br><br><br>2009 |
| Ashlee Simpson | **Bittersweet World:**<br><br>**<u>Harmon Masters</u>**<br>Bittersweet World<br>World Murder<br>Never Dream Alone<br>Outta My Head ( Ay Ya Ya)<br>Ragdoll<br>Rule Breaker<br>What I've Become | 2008 |
| Fantasia | **The Definition of …:**<br><br>**<u>Harmon Master</u>**<br>Crazy | 2016 |
| Fred Hammond | **Free To Worship:**<br><br>**<u>Harmon Masters</u>** | 2006 |

| | More of You<br>Simply Put | |
|---|---|---|
| Free Sol | **No Rules:**<br><br>**<u>Harmon Master</u>**<br>Fascinated (ft. Justin Timberlake &<br>Timbaland) | 2011 |
| Ginuwine | **A Man's Thoughts:**<br><br>**<u>Harmon Master</u>**<br>Get Involved (ft. Missy Elliott &<br>Timbaland) | 2009 |
| Jamie Fox | **Intuition:**<br><br>**<u>Harmon Master</u>**<br>I Don't Need It (ft. Timbaland) | 2008 |
| Keri Hilson | **No Boys Allowed:**<br><br>**<u>Harmon Masters</u>**<br>Beautiful Mistake<br>Breaking Point<br>Lie to Me (ft. Timbaland) | 2010 |
| Keyshia Cole | **Calling All Hearts:**<br><br>**<u>Harmon Master</u>**<br>Last Hangover | 2010 |
| Mario | **Go:**<br><br>**<u>Harmon Master</u>**<br>No Definition | 2007 |
| Michele Branch | **Get Away:**<br><br>**<u>Harmo Master</u>**<br>Getaway (ft. Timbaland) | 2010 |
| Pussycat Dolls | **Doll Domination:**<br><br>**<u>Harmon Masters</u>**<br>Halo<br>In Person<br>Magic<br>Watchamacallit | 2008 |
| Rick Ross | **Hood Billionaire:**<br><br>**<u>Harmon Master</u>**<br>Movin' Bass (ft. Timbaland) | 2014 |
| Shakira | **She Wolf:**<br><br>**<u>Harmon Master</u>** | 2009 |

5

|  | Give It Up To Me (ft. Lil Wayne) |  |
|--|--|--|
| Nas | **Season of Nasir:**<br><br>**<u>Harmon Masters</u>**<br><br>Sinatra in the Sands (ft. Justin Timberlake, Jay-Z & Timbaland) | 2013 |



# EXHIBIT C
# (HARMON-MOSLEY SETTLEMENT AGREEMENT)
## *Filed Under Seal*